490 S.E.2d 8

**T. Walter BRASHIER, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION,**
**Interwest Carolina Transportation Group, L.L.C., and**
**Connector 2000 Association, Inc., Respondents.**

No. 24665.

Supreme Court of South Carolina.

Heard May 6, 1997.

Decided Aug. 6, 1997.

Ray D. Lathan, of Lathan & Barbare, P.A., Greenville, for appellant.

J. Douglas Nunn, of Nelson Mullins Riley & Scarborough, L.L.P., Columbia, for respondent South Carolina Department of Transportation.

Jack H. Tedards, Jr., of Leatherwood Walker Todd & Mann, P.C., Greenville, for respondent Interwest Carolina Transportation Group, L.L.C.

Steve A. Matthews, Robert Y. Knowlton, and John K. Van Duys, of Sinkler & Boyd, P.A., Columbia, for respondent Connector 2000 Association, Inc.

Suzanne E. Coe, Greenville, for amicus curiae petitioners Bobby J. Ayers, David Wettlin, and Wayne Taylor, individual-

ly and as citizens, residents, taxpayers and registered electors of Greenville County.

WALLER, Justice:

On appeal is an order upholding an innovative financing scheme to build a toll-access highway in Greenville County. We affirm as modified.

## FACTS/PROCEDURAL POSTURE

The proposed highway, known as the Southern Connector, will connect interstate highways I–85 and I–385 around the southern perimeter of the City of Greenville. It will be an approximately sixteen-mile-long, four-lane toll-access highway with a 70 miles per hour design speed. After many years of consideration and planning, on July 1, 1995, the South Carolina Department of Transportation ("SCDOT") issued a request for proposals seeking developmental concepts and financing options for the Southern Connector. Concurrently, SCDOT issued a request for proposals to extend South Carolina Highway 153 ("SC 153") from its existing terminus at I–85 to connect with the Southern Connector.[1]

On January 5, 1996, Interwest Carolina Transportation Group, L.L.C. ("Developer")[2] submitted its proposal to SCDOT. On February 29, 1996, SCDOT awarded Developer the right to negotiate a contract to finance and build the Projects. The resulting plan to finance, develop and operate the Projects is embodied in four agreements.[3]

---

1. When necessary, the Southern Connector and SC 153 projects will be collectively referred to as "the Projects."

2. Developer was formed December 29, 1995, to act as the developmental entity for the Projects. It consists of: (1) Florence & Hutcheson, Inc., a South Carolina engineering firm specializing in highway construction; (2) Thrift Bros., Inc., a South Carolina paving contractor; and (3) Interwest Management, Inc., an Arizona engineering and consulting firm.

3. (1) Association–Developer Agreement; (2) Agreement to Develop the Southern Connector and SC 153; (3) First Amendment to the Development Agreement; and (4) License Agreement. Unless otherwise specified, general references throughout this opinion to "agreements" are

Essentially, under the agreements, three separate entities will be involved in the Southern Connector Project: SCDOT, Developer, and a nonprofit public benefit corporation without members called the Connector 2000 Association, Inc. ("Association").[4] Association will pay Developer to construct the Southern Connector with proceeds from tax-exempt toll revenue bonds. These bonds will be issued by Association, to be repaid with the revenues of a toll exacted upon users of the Southern Connector. Association will not have title in the Southern Connector. The agreements provide that "[f]ee simple title to the Southern Connector, all tolling facilities and all real property and improvements thereon and the rights of way thereunder is and at all times shall remain vested in SCDOT." Association will pay SCDOT a fee for a license to operate and collect tolls on the Southern Connector. Payment of the license fee will be subordinate to the repayment of the toll bonds and to the cost of operating and maintaining the Southern Connector. Once the bonds have been defeased, Association's license will expire, Association will dissolve and all of its assets will be distributed to SCDOT.

Regarding the SC 153 Project, SCDOT will pay for its construction with the proceeds of general obligation state highway bonds. After its completion, SC 153 will be owned, operated and maintained by SCDOT and will not be toll-access.

Appellant T. Walter Brashier[5] filed a declaratory judgment action seeking to have these agreements invalidated and to permanently enjoin SCDOT from performing them. He argued SCDOT was required to comply with section 57–3–615 of the South Carolina Code before initiating the Southern Connector Project, and that in any event the agreements violate

intended to mean the entire scheme as embodied in these four agreements.

**4.** Association, incorporated January 12, 1996, was formed to facilitate the financing of the Southern Connector Project. It is governed by a five-member Board of Directors, serving in a volunteer capacity, comprised of business and civic leaders in Greenville.

**5.** Appellant owns approximately 1300 acres of land located in the planned path of the Southern Connector, on which he intends to develop a golf course and industrial park.

several constitutional provisions. The case was referred to a master-in-equity with direct appeal to this court.[6] After a hearing, the master issued an order denying Appellant injunctive relief, finding compliance with section 57–3–615 was not required and the agreements were constitutional.

## ISSUES

I.  Was compliance with section 57–3–615 of the South Carolina Code required before SCDOT could initiate the Southern Connector Project?

II.  Does the plan to finance the Southern Connector violate Article X, section 11 of the South Carolina Constitution?

III.  Do the agreements improperly delegate SCDOT's authority?

## DISCUSSION

### I.  Section 57–3–615

Appellant argues SCDOT's ability to enter into the agreements is limited by the following provision:

> If a toll is administered on a project by the Department of Transportation, the toll must be used to pay for the construction, maintenance costs, and other expenses for only that project. *A toll project that is in excess of one hundred fifty million dollars may only be initiated as provided in Chapter 37 of Title 4.*

S.C.Code Ann. § 57–3–615 (Supp.1996) (emphasis added). The master ruled compliance with this section was not required because it violated Article VIII, section 14 of the South Carolina Constitution. Appellant argues this ruling was error. We disagree and affirm the master's finding of unconstitutionality.

Under section 57–3–615, certain toll projects *may only* be initiated as provided in Chapter 37 of Title 4. *See* S.C.Code

---

**6.**  Also allowed to argue before the master were certain *amicus curiae* petitioners. These petitioners are a group of Greenville taxpayers who have filed a separate lawsuit attacking the Southern Connector Project for reasons similar to those raised by Appellant. Their lawsuit has been stayed pending resolution of the case *sub judice.* Petitioners were allowed to file an *amicus curiae* brief in this case.

Ann. §§ 4–37–10 to –40 (Supp.1996). This chapter prescribes procedures which a county may employ to finance and construct highways, roads, streets, bridges, etc. Counties may raise revenue for such projects by either sales and use taxes or by toll revenue bonds. *Id.* at § 4–37–40. Voter approval is required in a county-wide referendum to accomplish whatever project is desired. *Id.* at § 4–37–30(B).

■ Article VIII, section 14(6) of the South Carolina Constitution provides: "In enacting provisions required or authorized by this article, general law provisions applicable to the following matters shall not be set aside: ... (6) the structure and the administration of any governmental service or function, responsibility for which rests with the State government or which requires statewide uniformity." Article VIII, section 14 "precludes the legislature from delegating to counties the responsibility for enacting legislation relating to the subjects encompassed by that section." *Robinson v. Richland County Council,* 293 S.C. 27, 30, 358 S.E.2d 392, 395 (1987). When construing Article VIII, section 14, this Court has consistently held a subject requiring statewide uniformity is effectively withdrawn from the field of local concern. *See, e.g., Davis v. County of Greenville,* 322 S.C. 73, 76, 470 S.E.2d 94, 96 (1996) ("Article VIII, § 14 limits the powers local governments may be granted"); *Kramer v. County Council,* 277 S.C. 71, 282 S.E.2d 850 (1981) (per curiam); *Douglas v. McLeod,* 277 S.C. 76, 282 S.E.2d 604 (1981). We have already held that "[t]he planning, construction, and financing of state roads is a governmental service which requires statewide uniformity." *Town of Hilton Head Island v. Coalition of Expressway Opponents,* 307 S.C. 449, 456, 415 S.E.2d 801, 805 (1992).

■ Based on this authority, we hold section 57–3–615 violates Article VIII, section 14(6). Section 57–3–615 requires compliance with Chapter 37 of Title 4 in order to build certain toll projects in the State. Under this chapter, the decision of whether to construct these projects rests entirely within counties' discretion. Counties are under no obligation to even submit a certain project to a referendum. *See* S.C.Code Ann. § 4–37–10 (Supp.1996) (county must comply with requirements of chapter if it *chooses* to finance construction of a transportation-related project; county may *choose* to enter

into agreement with other governmental entities). Furthermore, the State, with which the duty to plan, construct, maintain and operate the state highway system has been entrusted, and which has been specifically authorized to finance state roads with tolls, has no other method of building these toll roads other than by getting county approval. *See* S.C.Code Ann. §§ 57–1–30; 57–3–200 (Supp.1996). Thus, counties have been delegated the authority to approve or disapprove a governmental service requiring statewide uniformity. The master correctly held Article VIII, section 14(6) forbids such delegation.[7] We find, however, the master erred in ruling section 57–3–615 unconstitutional only as applied to the Southern Connector Project. He based this limitation on his finding that some highway projects might be of a "purely local nature." This finding conflicts with the holding from *Town of Hilton Head Island*, which we have here reaffirmed, that state highway projects require statewide uniformity. Therefore, we modify the master's ruling to hold section 57–3–615 unconstitutional on its face.

## II. Article X, section 11

### A. Pledge of State's Credit

■ "The credit of neither the State nor any of its political subdivisions shall be pledged or loaned for the benefit of any [private entity]." S.C. Const. art. X, § 11. Appellant argues the Southern Connector Project's financing scheme violates this section. We disagree.

---

7. In light of this ruling we decline to address the master's ruling the provisions of section 57–3–615 do not apply to the Southern Connector Project because it was initiated before the effective date of the act and because its costs do not exceed $150 million.

Additionally, we decline to address the argument of Respondents Developer and Association that affirmance is proper on the additional sustaining ground section 57–3–615 violates equal protection and due process. This issue is unpreserved because it was not ruled on by the trial judge, and while these Respondents claim it was raised below, there is no evidence in the record of this. *O'Tuel v. Villani*, 318 S.C. 24, 455 S.E.2d 698 (Ct.App.1995) (citing *Carter v. Peace*, 229 S.C. 346, 93 S.E.2d 113 (1956)) (even if matter was raised to trial judge, proposition relied on as additional sustaining ground must be presented to *and* passed on by trial court to warrant consideration on appeal).

There is no lending of the State's credit unless "general credit and taxing powers are pledged." *State ex rel Medlock v. South Carolina State Family Farm Dev. Auth.*, 279 S.C. 316, 320, 306 S.E.2d 605, 608 (1983). "The limitation imposed ... by Article X, § 11 ... 'relates *solely* to general obligation bonds payable from the proceeds of *ad valorem* tax levies.'" *Carll v. South Carolina Jobs–Economic Dev. Auth.*, 284 S.C. 438, 443–44, 327 S.E.2d 331, 335 (1985) (quoting *Elliott v. McNair*, 250 S.C. 75, 85, 156 S.E.2d 421, 426 (1967)) (emphasis added). See also *Johnson v. Piedmont Mun. Power Agency*, 277 S.C. 345, 353, 287 S.E.2d 476, 481 (1982) ("bonds issued [by the State] which are payable out of special funds [such as revenue bonds] do not create debts"); *Elliott*, 250 S.C. at 86, 156 S.E.2d at 427 ("The word 'credit' as here used was intended to protect the state against *pecuniary* liability") (emphasis added).

■ Here, the Southern Connector Project is not being financed with general obligation bonds, nor is the State required to use any tax revenues to pay the bonds. To the contrary, the bonds will state on their face they are payable solely from and secured by toll revenues collected from users of the Southern Connector, and will not be a debt or loan of credit of the State. This Court has repeatedly held similar disclaimers sufficient to protect the State from pecuniary liability. *See, e.g., Carll*, 284 S.C. at 444, 327 S.E.2d at 335; *Medlock*, 279 S.C. at 320, 306 S.E.2d at 609; *Bauer v. South Carolina State Housing Auth.*, 271 S.C. 219, 246 S.E.2d 869 (1978). Furthermore, Association will issue the bonds, not the State. In no way can the State be legally obligated to pay the bonds. While Appellant argues the State may be morally obligated to pay off the bonds should toll revenues fall short, this same argument was made to and dismissed by the court in *Carll*: "Appellant speculates that if the Authority defaults on its bonds, the State may choose to pay off the bonds. The purpose of [Article X, section 11] is to prevent the State from being *obligated* to use State tax revenues to pay off the bonds." 284 S.C. at 444, 327 S.E.2d at 335 (emphasis in original). There will be no pledge of the state's credit.

## B. Joint Ownership

■ "Neither the State nor any of its political subdivisions shall become a joint owner of or stockholder in any company,

association, or corporation." S.C. Const. art. X, § 11. Appellant argues SCDOT has become a joint owner of Association and the Southern Connector. We disagree.

SCDOT has a certain amount of control over Association. Directors of Association are subject to approval by SCDOT and SCDOT can remove any director for cause. Also, upon Association's dissolution its assets will be distributed to SCDOT. However, this involvement is insufficient to create joint ownership in Association or in the Southern Connector by SCDOT. SCDOT is not a stockholder in Association. The agreements make it clear the Southern Connector will be owned by SCDOT but operated by Association. "[T]his Court has never held a public entity's naked title to property operated by a private entity resulted in unconstitutional joint ownership." *Johnson v. Piedmont Mun. Power Agency,* 277 S.C. 345, 355, 287 S.E.2d 476, 481 (1982) (also noting public entity had acquired neither stock nor any other form of ownership in private company). At no time will SCDOT and Association jointly own anything. *Nichols v. South Carolina Research Auth.,* 290 S.C. 415, 351 S.E.2d 155 (1986), cited by Appellant, is clearly distinguishable. In *Nichols,* a state agency admitted that in carrying out joint ventures, it planned to procure ownership interests in private entities. *Id.* at 421, 351 S.E.2d at 158.

"This project is admittedly a complex undertaking, but complexity alone does not condemn it under our Constitution." *Johnson,* 277 S.C. at 354, 287 S.E.2d at 481. The State will not be a joint owner in any private entity.

### III. State Delegation of Authority

#### A. Setting of Toll Rates

Article X, section 5 of the South Carolina Constitution states that "[n]o tax, subsidy or charge shall be established, fixed, laid or levied, under any pretext whatsoever, without the consent of the people or their representatives lawfully assembled." Appellant argues the tolls constitute a tax, and SCDOT delegated its authority to set the tolls (i.e. to tax) because it must consult with Association before revising toll rates and because Association sets the optimum toll rates. We disagree.

Under the License Agreement, toll rates will be set in the following manner:

> **Section 3.4. Toll Rates.** Pursuant to Section 57–5–1340 of the Code, SCDOT hereby fixes the initial toll rates for the Southern Connector at those rates as set forth on Exhibit 1. SCDOT, after consultation with the Association, shall have the right (but not the obligation) to revise such toll rates from time to time to rates which are not less than 90% and not more than 120% of the optimum toll rates as estimated by an independent traffic consultant retained by the Association. Notwithstanding the foregoing, all toll rates must satisfy the applicable rate covenants contained in the Association's financing documents with the Lender(s) or otherwise applicable to any Project Debt.

Initially, the tolls will not constitute a tax. *See, e.g., State v. State Toll Bridge Auth.*, 210 Ga. 690, 82 S.E.2d 626 (1954) (tolls collected to reimburse building and maintenance costs do not constitute payment of taxes); *North Carolina Turnpike Auth. v. Pine Island, Inc.*, 265 N.C. 109, 143 S.E.2d 319, 325 (1965) ("Tolls are not taxes"). Furthermore, an independent expert will be estimating the appropriate toll rate, not Association. The contract does not require Association's consent before SCDOT can revise the toll rates. Therefore, even assuming the tolls charged would be considered a tax, there is no violation of Article X, section 5 and no improper delegation.[8]

---

8. We reject Appellant's argument SCDOT has not been given the statutory authority to set toll rates. SCDOT has the power to "fix and revise from time to time and charge and collect tolls for transit over each turnpike facility constructed by it." S.C.Code Ann. § 57–5–1340(2) (1976). Appellant's argument SCDOT is not constructing the Southern Connector is meritless. SCDOT is a party to the agreements and will own the highway being constructed. Finally, appellant's argument the Southern Connector is not a turnpike facility because it will not be financed with state turnpike bonds is equally meritless. "Turnpike facility" is defined as a "highway constructed under the provisions of this article by the department, *whether or not financed with turnpike bonds....*" S.C.Code Ann. § 57–5–1320(2) (Supp.1996). *See also id.* at § 57–5–1330 (giving SCDOT power to build turnpike facilities whenever it determines such facility is justified); *id.* at § 57–5–1350 (SCDOT *may* request issuance of state turnpike bonds to finance facility). Turnpike facilities do not have to be financed by the issuance of state turnpike bonds.

## B. *Noncompetition Agreement*

■ Appellant argues SCDOT improperly delegated its police power to plan and implement highways by covenanting not to build "Competitive Transportation Facilities"[9] within a specified geographical area ("Zone")[10] of the Southern Con-

---

Additionally, to the extent SCDOT has agreed to contractually limit its own authority by way of this agreement, we find no improper delegation for the reasons discussed *infra* in Part III(B).

9. Competitive Transportation Facilities are defined as:

[A]ny facilities which are not Exempt Transportation Facilities and which are one of the following:

(a) any tolled or non-tolled State Highway, expressway or freeway which (i) is placed into service after the Agreement Date and (ii) is located within the [Zone];

(b) any new lanes for use by all types and occupancies of motor vehicles (except those developed by [Developer] and/or the Association) (i) which are added to State Highways existing as of the Agreement Date, (ii) which are not necessary for improved safety, or emergency maintenance purposes, (iii) which are placed into service after the Agreement Date, (iv) which are located within the [Zone], and (v) which have a materially adverse impact on Total Revenues.

Exempt Transportation Facilities are defined as:

* Any State project listed in the approved 1995 State Transportation Improvement Plan[;]

* Any State highway improvement, enhancement or modification necessary for improved safety or emergency maintenance purposes;

* Any action or program carried out by any city, county or other non-state jurisdiction which has not included funding provided by SCDOT; and

* Any improvements which do not add vehicle capacity or significantly improve operating speed on competitive routes.

* Any state project which is determined to have no material adverse impact on the Total Revenues of the Southern Connector Project. For this purpose, "material adverse impact" shall mean a reduction in the estimated Total Revenues following completion of the Competitive Transportation Facility which would, with the delivery of notice, the passage of time, or both, give rise to the occurrence of an Event of Default of the Association under any Agreement evidencing or securing any Project Debt.

10. Greenville County, south of and including the following routes:

* U.S. Route 123 at Pickens County Line to I-385 in Greenville;
* I-385 from downtown Greenville to I-85; and
* I-85 from I-385 to Spartanburg County Line.

Anderson County south of and including I-85 and east of and including U.S. Route 76.

nector until termination of the agreements.[11]   We disagree.

SCDOT has been given the police power and duty to plan, construct, maintain, and operate the state highway system consistent with the needs and desires of the public.   S.C.Code Ann. § 57–1–30 (Supp.1996). *See also id.* at § 57–1–20 (establishing SCDOT as an administrative agency); 39 Am.Jur.2d *Highways, Streets & Bridges* § 32 (1968) (laying out of highways and streets for public use involves exercise of state's police power.   Initially, we point out that in making these covenants SCDOT did not actually give its authority to another entity; rather, it contractually limited its authority.   As a general rule, administrative bodies cannot alienate, surrender, or abridge their powers and duties, by contract or otherwise.[12] However, courts have upheld contracts entered into by administrative bodies or local governments arguably bartering away police power if that body has legislative authority to do so. *See, e.g., Vap v. City of McCook,* 178 Neb. 844, 136 N.W.2d 220 (1965) (contract to improve federal highways within city's borders whereby city, in order to secure federal funds, promised to prohibit parking on a certain street, held not an improper delegation because legislature authorized governmental entities to do whatever necessary to secure federal funds); *Bidlingmeyer v. City of Deer Lodge,* 128 Mont. 292, 274 P.2d 821 (1954).[13]   This is in keeping with the well-settled

---

Laurens County north of and including U.S. Route 76 and west of I–385.

**11.** The agreements will terminate upon repayment of the bonds, which should occur thirty-five years after issuance as currently scheduled.

**12.** *See, e.g., G. Curtis Martin Inv. Trust v. Clay,* 274 S.C. 608, 266 S.E.2d 82 (1980); *Sammons v. City of Beaufort,* 225 S.C. 490, 83 S.E.2d 153 (1954). *See also* 73 C.J.S. *Public Administrative Law & Procedure* § 56 (1983).

**13.** Noncompetition covenants of the sort included here have been allowed as part of bondholder agreements. *See, e.g., State v. State Toll Bridge Auth.,* 210 Ga. 690, 82 S.E.2d 626, 626 (1954) (legislature has authority to grant exclusive franchise "in the form of covenants with bondholders prohibiting the building of a bridge in competition within restricted limits"); *State v. Yelle,* 56 Wash.2d 86, 351 P.2d 493 (1960) (en banc); 40 Am.Jur.2d *Highways, Streets & Bridges* § 619 (1968) ("The legislature may so regulate the construction and operation of toll roads ... that no rival structure can lawfully be established within certain fixed distances").

principle such bodies may only exercise those powers specifically delegated to them. *See, e.g.,* S.C.Code Ann. § 57–1–20 (Supp.1996) (SCDOT shall have such functions and powers as and powers as provided by law); *Riley v. South Carolina State Hwy. Dept.,* 238 S.C. 19, 118 S.E.2d 809 (1961) (powers exercised by Highway Department must be found in some legislative act because it has no inherent authority). Thus, the issue here is whether SCDOT has legislative authority to enter into noncompetition agreements such as are involved here. We hold that it has.

To accomplish its functions and purposes of "the systematic planning, construction, maintenance, and operation of the state highway system ... consistent with the needs and desires of the public," [14] SCDOT has the following relevant powers. Generally, it has the power to "lay out, build, and maintain public highways and bridges." [15] It may "enter into such contracts as may be necessary for the proper discharge of its functions and duties," and "do all other things required or provided by law." [16] More specifically, SCDOT has been given authority to "enter into ... partnership agreements with ... private entities to finance, by tolls and other financing methods, the cost of acquiring, constructing, equipping, maintaining and operating highways, roads, streets and bridges in this State." [17] SCDOT has the discretionary power to construct turnpike facilities.[18] To accomplish the express powers granted it regarding turnpike facility construction, SCDOT may "[d]o all acts and things necessary or convenient." [19] Here, SCDOT found it necessary to enter into these covenants because of the understandable practical concerns future bondholders would have regarding bond repayment. We find the legislature gave SCDOT the power to enter into such cove-

14. S.C.Code Ann. § 57–1–30 (Supp.1996).

15. S.C.Code Ann. § 57–3–110(1) (Supp.1996).

16. S.C.Code Ann. §§ 57–3–110(10), –110(12) (Supp.1996).

17. S.C.Code Ann. § 57–3–200 (Supp.1996).

18. S.C.Code Ann. § 57–5–1330(1) (Supp.1996).

19. S.C.Code Ann. § 57–5–1340(8) (1976).

nants as part of its broad power to contract.[20]  We therefore affirm the master's ruling of no improper delegation.

Finally, we affirm the remaining arguments raised in Appellant's brief pursuant to Rule 220(b)(1), SCACR, and the following authorities: *Issue VII: Anderson v. Baehr*, 265 S.C. 153, 217 S.E.2d 43 (1975); *Carll v. South Carolina Jobs-Economic Dev. Auth.*, 284 S.C. 438, 327 S.E.2d 331 (1985). *Issue VIII: Nichols v. South Carolina Research Auth.*, 290 S.C. 415, 351 S.E.2d 155 (1986).

**AFFIRMED AS MODIFIED.**

FINNEY, C.J., and MOORE and BURNETT, JJ., concur.

GEORGE T. GREGORY, Jr., Acting Associate Justice, not participating.

---

**20.**  We note the legislature has recognized the importance of noncompetition covenants as part of bond resolutions.  *See* S.C.Code Ann. § 4–37–30(B)(5)(f) (Supp.1996) (county transportation authority must disclose all such covenants made in its bond resolution); § 57–5–1450 (Supp.1996) (in making state bond resolutions, State Budget and Control Board may prescribe any noncompetition covenants deemed necessary).