552 S.E.2d 737

**HORRY COUNTY SCHOOL DISTRICT, Appellant,**

v.

**HORRY COUNTY and the City of Myrtle Beach, Respondents.**

No. 25355.

Supreme Court of South Carolina.

Heard Jan. 11, 2001.

Decided Sept. 4, 2001.

---

5. The stated costs are $233.45.

Kenneth L. Childs, William F. Halligan, and John M. Reagle, of Childs & Halligan, of Columbia; and Wallace K. Lightsey and John C. Moylan, of Wyche, Burgess, Freeman & Parham, of Greenville, for appellant.

John P. Henry, of The Thompson Law Firm, of Conway; Emma Ruth Brittain, of The Thompson Law Firm, of Myrtle Beach; Thomas A. Hutcheson, of Sinkler & Boyd, of Charleston; and B. Eric Shytle, of Sinkler & Boyd, of Columbia, for respondents.

Burnet R. Maybank, III, of Nexsen Pruet Jacobs & Pollard, of Columbia for amici curiae South Carolina Chamber of Commerce and South Carolina Manufacturer's Association.

Terry E. Richardson, Jr. of Ness, Motley, Loadholt, Richardson & Poole, of Barnwell, for amicus curiae Barnwell School District 45.

Roy D. Bates, of Columbia, for amicus curiae Municipal Association of South Carolina.

Robert E. Lyon, Jr. and Kelly J. Golden, both of Columbia, for amicus curiae South Carolina Association of Counties.

Richard M. Gergel and W. Allen Nickles III, of Gergel, Nickles & Solomon, of Columbia; and Dwight F. Patterson, Jr., of Perrin, Perrin, Mann & Patterson, of Spartanburg, for amici curiae South Carolina School Boards Association, South Carolina Association of School Administrators, South Carolina Education Association, Palmetto State Teachers Association,

South Carolina Association for Rural Education, South Carolina Alliance of Black School Educators, South Carolina Association of School Psychologists, and South Carolina League of Women Voters.

BURNETT, Justice:

This is an appeal from an order of the circuit court granting summary judgment to respondents Horry County and the City of Myrtle Beach (collectively "the county"). The Horry County School District brought suit challenging the constitutionality of S.C.Code Ann. §§ 4-1-170 and -175 (Supp.2000) and Horry County Council Ordinances Nos. 171-99, 174-99, and 57-00. The trial court granted summary judgment to the county. We affirm.

## FACTS

This controversy arose when Horry County initiated creation of a multi-county business park (MCBP) in conjunction with contiguous Marion, Georgetown, and Dillon Counties. The MCBP consists of twenty-seven separate tracts of land covering 3,889.23 acres situated wholly within Horry County and partially within the limits of the City of Myrtle Beach.

The Horry County School District is coterminous with Horry County and the City of Myrtle Beach is located entirely within the county and the school district. The school district has authority to levy *ad valorem* taxes. The Horry County Board of Education prepares an annual budget and determines the necessary millage for the operation of schools for the succeeding year. The county auditor sets the millage for the school district's debt service. The Myrtle Beach City Council and the Horry County Council also establish annual budgets and determine annually the millage necessary for their respective operations. The Horry County Council plays no role in setting, levying, or approving the budget or millage of the school district.

For the 1999–2000 fiscal year, the county levied 56 mills in unincorporated areas of the county and 40.9 mills in incorporated areas, the city levied 61 mills, and the school district levied 91 mills for school operations and 22 mills for debt service, for a total of 113 mills for school purposes. Thus,

based on the 1999–2000 millage rates and disregarding the effect of the MCBP, the school district would receive 67% of all property tax revenues in unincorporated areas and approximately 53% of the revenues in Myrtle Beach.

As discussed *infra,* property within the MCBP is constitutionally exempt from *ad valorem* taxation, but the owners must nevertheless pay an amount equivalent to the taxes that would otherwise have been due. The agreement creating the MCBP at issue in this case allocates the revenue derived from property situated within the MCBP without regard to the millage imposed by the various taxing entities. Specifically, the agreement allocates 50% of MCBP revenue to the school district.

## DISCUSSION

The school district presents several issues, however, in essence, the sole issue on appeal is whether the county has complete discretionary authority to allocate the revenue from the fee in lieu of taxes paid by the MCBP. This issue poses two sub-issues: (1) did the trial court correctly construe the MCBP statutes to give the county this discretion? and (2) are the statutes as construed constitutional? We conclude the trial court correctly construed the statutes and the statutes are constitutional.

### I. Statutory Construction

The district argues the trial court erred in construing § 4–1–170 (Supp.2000) as granting the county discretion over the allocation of revenue from MCBPs. We disagree.

In 1988, the voters of this state were asked to approve an amendment to the South Carolina Constitution authorizing the creation of MCBPs. The ballot question read as follows:

Shall Section 13 of Article VIII of the Constitution of this State be amended so as to provide that counties, subject to the General Assembly first providing by law for bonded indebtedness and school fiscal ability considerations, may jointly develop an industrial or business park with other counties within the geographical boundaries of one or more of the member counties where the area comprising the parks and all property having a situs therein is exempt from

all ad valorem taxation because the owners or lessees of any property situated in the park must pay an amount equivalent to the property taxes or other in-lieu-of payments that would have been due and payable except for the above exemption?

Jt. Res. No. 690 (S.C.1988). The proposed amendment was billed as a means to help rural counties. *See Amendment Benefits Rural Counties,* The State, Oct. 18, 1988, at Metro 1. The voters approved the ballot question and the following amendment was added to the Constitution:

Counties may jointly develop an industrial or business park with other counties within the geographical boundaries of one or more of the member counties. *The area comprising the parks and all property having a situs therein is exempt from all ad valorem taxation. The owners or lessees of any property situated in the park shall pay an amount equivalent to the property taxes or other in-lieu-of payments that would have been due and payable except for the exemption herein provided.* The participating counties shall reduce the agreement to develop and share expenses and revenues of the park to a written instrument which is binding on all participating counties. Included within expenses are the costs to provide public services such as sewage, water, fire, and police protection. Notwithstanding the above provisions of this subsection, before a group of member counties may establish an industrial or business park as authorized herein, *the General Assembly must first provide by law for the manner in which the value of the property in the park will be considered for purposes of bonded indebtedness of political subdivisions and school districts and for purposes of computing the index of taxpaying ability* pursuant to any provision of law which measures the relative fiscal capacity of a school district to support its schools based on the assessed valuation of taxable property in the district as compared to the assessed valuation of the taxable property in all school districts of this State.

S.C. Const. Art. VIII, § 13(D) (emphasis added). Thus, before any MCBPs could be created, the General Assembly was required to enact legislation specifying how the value of park property would be considered relative to specific areas of

school funding (bonded indebtedness and the index of taxpaying ability [1]).

In accordance with the requirements of the constitutional amendment, the legislature enacted S.C.Code Ann. § 4–1–170 (Supp.2000), which provides:

> By written agreement, counties may develop jointly an industrial or business park with other counties within the geographical boundaries of one or more of the member counties as provided in Section 13 of Article VIII of the Constitution of this State. The written agreement entered into by the participating counties must include provisions which:
>
> (1) address sharing expenses of the park;
>
> (2) specify by percentage the revenue to be allocated to each county;
>
> (3) specify the manner in which revenue must be distributed to each of the taxing entities within each of the participating counties.
>
> For the purpose of bonded indebtedness limitation and *for the purpose of computing the index of taxpaying ability* pursuant to Section 59–20–20(3), *allocation of the assessed value of property within the park* to the participating counties and to each of the taxing entities within the participating counties *must be identical to the allocation of revenue* **received and retained** by each of the counties and by each of the taxing entities within the participating counties. . . .

§ 4–1–170 (emphasis added). Thus, as far as the Index of Taxpaying Ability is concerned, a school district will not be penalized for the value of MCBP property in its district if it does not actually receive funds from that property.

Statutes governing fees in lieu of taxes also address the allocation of revenue from MCBPs [2]:

---

**1.** The index of taxpaying ability measures a local school district's fiscal capacity relative to all other school districts in the state and distributes state education funds accordingly. *See* S.C.Code Ann. § 59–20–20(3) (Supp.2000).

**2.** We reject the district's argument that the "amount equivalent to property taxes" constitutionally required of MCBPs is somehow not a

For a project *not* located in an industrial development park as defined in § 4–1–170, distribution of the fee in lieu of taxes on the project must be made *in the same manner and proportion that the millage levied for school and other purposes would be distributed if the property were taxable.* § 4–29–67(L)(1) (Supp.1999) (emphasis added). Conversely, "for a project located in an industrial development park as defined in § 4–1–170, distribution of the fee in lieu of taxes on the project must be made *in the manner provided for by the agreement* establishing the industrial development park." § 4–29–67(L)(2).[3]

Under the terms of the agreement creating the MCBP at issue in this case, 1% of the revenue from the MCBP would be allocated to and divided equally among Marion, Georgetown, and Dillon Counties. The remaining 99% would be allocated to Horry County. Within Horry County, the agreement provides for allocation of revenue as follows:

50% to the Horry County School District

25% to the Horry County General Fund

24% to the retirement of debt instruments ... intended to finance the acquisition by Horry County of Qualifying Public Infrastructure ... in the Park.

Thus, the school district receives a smaller portion of the revenues from the MCBP fee in lieu of taxes under the agreement than it would receive if the property contained in the MCBP were subject to *ad valorem* taxes. The district

---

fee in lieu of taxes, especially since the fee in lieu statutes specifically reference § 4–1–170. The fact that special rules apply to fees owed on property in MCBPs does not mean they are not "fees in lieu of taxes."

**3.** *See also* the Fee in Lieu of Tax Simplification Act, enacted in 1997:

(A) For a project not located in a multicounty park, distribution of the fee payments on the project must be made in the same manner and proportion that the millage levied for school and other purposes would be distributed if the property were taxable.

(B) For a project located in a multicounty park, distribution of the fee payments on the project must be made in the same manner provided for by the agreement between or among counties establishing the multicounty park.

S.C.Code Ann. § 12–44–80 (1999). Also, S.C.Code Ann. § 4–12–30(K)(1) & (2) contains almost identical provisions to those in § 4–29–67(L)(1) & (2).

argues these statutes should not be construed to allow this result.

This Court cannot construe a statute without regard to its plain and ordinary meaning and may not resort to subtle or forced construction in an attempt to limit or expand a statute's scope. *Berkebile v. Outen,* 311 S.C. 50, 426 S.E.2d 760 (1993). "A statute must receive such construction as will make all of its parts harmonize with each other and render them consistent with its general scope and object." *Davis v. County of Greenville,* 322 S.C. 73, 470 S.E.2d 94 (1996).

Reading these statutes together, there is clearly no requirement that revenue from the fee in lieu of taxes from an MCBP be distributed in the same proportion that it would be if the property were taxable. First, Article VIII, § 13(D) and § 4–1–170 exempt property in MCBPs from *ad valorem* taxation and permit the county to enter agreements specifying how MCBP revenue will be distributed. Second, § 4–1–170(2) specifically allocates that revenue to the county, not to any another taxing entity. Third, while § 4–1–170 clearly contemplates some allocation to the other taxing entities within the county,[4] neither § 4–1–170 nor the fee in lieu statutes require the county to distribute to the district a proportion of MCBP funds identical to the district's millage, as required for other fee in lieu revenue. Fourth, § 4–1–170 contemplates that a school district might not receive the funding from MCBPs that it would from taxable property by specifying that the index of taxpaying ability will be calculated based on funds "received and retained" by the school district.[5] If the legislature had intended to require counties to distribute MCBP revenue in the same proportion as if the property were taxable, it could have said so in plain terms *exactly as it did concerning tax exempt non-MCBP property.* Compare § 4–29–67(L)(1) *with*

---

**4.** Section 4–1–170(3) provides the agreement must "specify the manner in which revenue must be distributed *to each of the taxing entities* within each of the participating counties." We read this language as requiring some allocation to each of the taxing entities within the county.

**5.** As will be discussed *infra,* part II, the Education Finance Act also addresses this issue with similar language. *See* S.C.Code Ann. § 59–20–20(3) (Supp.2000).

§ 4–29–67(L)(2); *See also Tilley v. Pacesetter*, 333 S.C. 33, 508 S.E.2d 16 (1998) (if legislature had intended certain result in statute it would have said so).

Although we conclude the circuit court properly interpreted the statutes at issue here, we note an inadequacy in the agreement itself. This issue is not before us. We address it only to advise the parties of our concern. Section 4–1–170(3) requires the agreement creating the MCBP to "specify the manner in which revenue must be distributed to each of the taxing entities within each of the participating counties." The agreement here allocates 50% of MCBP revenue to the Horry County School District with no basis for determining what proportion goes to debt service and what proportion to school operations. Nor does the agreement provide a basis for determining whether the auditor, who sets debt millage, or the school board, which sets operational millage, would make the allocation. This deficiency in the agreement does not invalidate the MCBP statutes, but may require the amendment of the agreement.

II. Constitutional Challenge

■ The district makes numerous arguments challenging the constitutionality of §§ 4–1–170 and –175 as construed. The district does not ask us to invalidate the statutes; rather, it asks us to construe the statutes in such a way as to render them constitutional. All statutes are presumed constitutional and will, if possible, be construed so as to render them valid. *Davis v. County of Greenville*, 322 S.C. 73, 470 S.E.2d 94, (1996). We address only those arguments we believe have merit.

A. Article VIII, § 14

■ The district argues that §§ 4–1–170 and –175 as construed are unconstitutional because Article VIII, § 14 of the South Carolina Constitution prohibits the County Council from using an MCBP agreement to interfere with the state system of financing public education. We find no constitutional violation.

Article VIII, § 14 provides that provisions enacted by local governments shall not set aside general law provisions applica-

ble to "(3) bonded indebtedness of governmental units; . . . and (6) the structure and the administration of any governmental service or function, responsibility for which rests with the State government or which requires statewide uniformity." S.C. Const. Art. VIII, § 14. Public education is a state function. *See Moye v. Caughman*, 265 S.C. 140, 143, 217 S.E.2d 36, 37 (1975) (public education is not the duty of the counties, but of the General Assembly).

■ The district argues §§ 4-1-170 and -175, as construed by the circuit court, allow the county to "set aside" many provisions of state law governing school district operational finances, bonded debt, and educational standards. Specifically, the district argues the statutes unconstitutionally allow the county to interfere with the schools' general obligation debt and manipulate the index of taxpaying ability by decreasing the taxable property in the district.

Although Article VIII, § 14 specifically speaks only to local ordinances that "set aside" general laws, this Court has also invoked Article VIII, § 14 to invalidate state statutes which impermissibly delegate to counties functions requiring statewide uniformity. *See, e.g., Davis v. County of Greenville*, 322 S.C. 73, 76, 470 S.E.2d 94, 96 (1996) ("Article VIII, § 14 limits the powers local governments *may be granted.*") (emphasis added); *Robinson v. Richland County Council*, 293 S.C. 27, 30, 358 S.E.2d 392, 395 (1987) ("[Article VIII, § 14] precludes the legislature from delegating to counties the responsibility for enacting legislation relating to the subjects encompassed by that section."). Relying on Article VIII, § 14, we have held unconstitutional statutes which gave counties improper authority over certain state functions. *See, e.g., Douglas v. McLeod*, 277 S.C. 76, 282 S.E.2d 604 (1981) (invalidating state statute delegating to counties power to set magistrates' salaries); *Brashier v. South Carolina Dep't of Transp.*, 327 S.C. 179, 490 S.E.2d 8 (1997), *overruled in part on other grounds*, *I'On v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000) (invalidating a statute which gave counties discretion to approve or disapprove the construction of toll roads).

■ The legislature has wide discretion in determining how to go about accomplishing its duty to "provide for the maintenance and support of a system of free public schools." *See*

*Richland County v. Campbell,* 294 S.C. 346, 349, 364 S.E.2d 470, 471–72 (1988); S.C. Const. art. XI, § 3. In *Richland County v. Campbell,* this Court upheld the constitutionality of shared funding of public schools by local and state revenues as set forth in the Education Finance Act, S.C.Code Ann. §§ 59–20–10 through –80 (1990 & Supp.2000).

The Education Finance Act specifically contemplates that schools might receive less money from fees in lieu of taxes than from taxable property:

> For purposes of disbursing EFA funding and for purposes of the index of taxpaying ability, the value of a fee in lieu of taxes shall be computed by the Department of Revenue by basing the computation on the net fee received and retained by the school district. The value thus computed shall not be inflated by any portion of the fee shared with or used by any other local taxing authority.

S.C.Code Ann. § 59–20–20(3) (Supp.2000). Thus, the district's taxpaying ability will be calculated based on revenue it actually receives from fees in lieu of taxes. In other words, the district will not be penalized by the existence of high-value but non-taxable MCBP property in the district. The MCBP legislation contains similar provisions:

> [F]or the purpose of computing the index of taxpaying ability pursuant to Section 59–20–20(3), allocation of the assessed value of property within the park to the participating counties and to each of the taxing entities within the participating counties must be identical to the allocation of revenue received and retained by each of the counties and by each of the taxing entities within the participating counties . . . .

§ 4–1–170. We conclude, in this facial challenge, the MCBP statutes are consistent with the Education Finance Act. However, because we read § 4–1–170 to require some allocation to the other taxing entities within the county (see footnote 4), we note the potential for a county to abuse the discretion granted under the statute.

The district also argues §§ 4–1–170 and –175 are unconstitutional as interpreted because they permit the county to interfere with the district's general obligation debt. As discussed above, we agree the agreement is inadequate in failing

to allocate funds between debt and operations. However, the problem is with the agreement, and not the statutes.

### B. Article X, §§ 5 and 6

Finally, the district argues §§ 4–1–170 & –175 as interpreted violate Article X, §§ 5 and 6 of the South Carolina Constitution because they permit the county to take revenue generated by school tax millage and use it for non-school purposes. We disagree.

Article X, § 5 provides in part that "[a]ny tax which shall be levied shall distinctly state the public purpose to which the proceeds of the tax shall be applied." Article X, § 6 provides in part that "[p]roperty tax levies shall be uniform in respect to persons and property within the jurisdiction of the body imposing such taxes." The trial court correctly ruled these provisions inapplicable because MCBPs are constitutionally exempt from *ad valorem* taxation. *See Quirk v. Campbell,* 302 S.C. 148, 151, 394 S.E.2d 320, 322 (1990) ("Respondents contend that § 4–29–67 does not violate Article X because the property which is the subject of the negotiated fee is exempt from *ad valorem* taxation under Article X, § 3(a). We agree."); *see also Elliott v. McNair,* 250 S.C. 75, 93, 156 S.E.2d 421, 431 (1967) ("Article X, Section 4, has been literally followed here inasmuch as the property is not subject to *ad valorem* taxes.").

In support of its position, the district cites the following passage from *Powell v. Chapman,* 260 S.C. 516, 520, 197 S.E.2d 287, 289 (1973):

> The essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution, enacted pursuant to legislative authority, in the exercise of the taxing power, the contribution being of a proportional character, payable in money, and imposed, levied, and collected for the purpose of raising revenue, to be used for public or governmental purposes. The question of whether a particular contribution, charge, or burden is to be regarded as a tax depends on its real nature and not on its designation.

(citation omitted). This Court went on to determine that the fee at issue in *Powell* was a "tax equivalent" and the subject

property therefore "taxable property" for purposes of determining the bonded indebtedness which a school district could incur under the constitutional limitation. *Id.* at 522, 197 S.E.2d at 290. This holding was subsequently endorsed by the legislature. *See* S.C.Code Ann. § 4–12–30(L) (Supp.2000).

▮ *Powell* is inapplicable to the issue here. Establishing that a fee is a "tax equivalent" for purposes of the bonded indebtedness limitation in no way requires the conclusion that revenue from the fee must be distributed in the same proportion as if it were a tax when the statute does not otherwise support such a conclusion.

### III. Policy Considerations

Although economic development is surely a worthy legislative goal, the prior discussion indicates many of the problems inherent in the MCBP scheme as it presently exists. We take this opportunity to give a brief overview of some of the practical ramifications of these statutes.

The MCBP scheme allows the county to determine unilaterally what percentage of revenue derived from the fee in lieu to allocate to schools. Certainly nothing in the ballot question authorizing the constitutional amendment alerted voters that this result was possible. On the contrary, voters were assured by public officials that school funding would not be affected. *See Amendment Benefits Rural Counties,* The State, Oct. 18, 1988, at Metro 1 (" 'It's important that voters understand that they are not exempting taxes,' Ed Burgess of the State Development Board said. 'All of the taxing entities will get their share. A contract will guarantee payment.' ").

The MCBP concept also allows the county to unilaterally remove unlimited property from the school district's jurisdiction, while continuing to rely on the school district's millage in determining the fee in lieu. If the county under-funds the school district and the school district raises its millage to make up the lost revenue, the MCBP's fee in lieu increases concomitantly, resulting in increased revenue for the county—without the accountability of raising taxes.

Furthermore, any reduction in funding from park revenues reduces the county's expected local effort and increases the district's eligibility for state funds. We can scarcely believe

the General Assembly intended, in authorizing the creation of MCBPs, to allow wealthy counties—like Horry County—to spuriously impoverish themselves at the expense of truly poor school districts. Nevertheless, the statute permits this result.

The school district and many *amici curiae* have argued passionately against the policies effected by the statutes at issue here. We sympathize with the schools' plight; however, this Court does not sit as a super-legislature. Granting the relief the district requests would involve re-writing § 4-1-170, under the guise of statutory construction, to require revenue from MCBP fees to be allocated in the same proportions as if the property were subject to *ad valorem* taxes.[6] Such action is the sole prerogative of the Legislature.

**AFFIRMED.**

TOAL, C.J., MOORE and WALLER, JJ., concur.
PLEICONES, J., concurring in part and dissenting in part in a separate opinion.

PLEICONES, Justice:

I concur in the majority's decision to uphold the circuit court's construction of the statutes and to uphold their constitutionality. Further, I share the concerns expressed regarding the policy implications of these statutes. I write separately, however, because I do not agree with the majority that a county is required to distribute any of the fee in lieu to the school district, nor that the allocation decision is subject to an abuse of discretion standard.

I can find no requirement in S.C.Code Ann. § 4-1-170 (Supp.2000), nor in any other of the relevant statutes that the county apply any particular formula in distributing the fee in lieu. In my view, the statutes permit the county to allocate 0% to a taxing entity in the county, including the affected school district, and therein lies the most troubling policy concern. As the majority recognizes, the remedy lies with the Legislature and not with this Court.

---

**6.** The Preservation of Schools Tax Base Act, introduced in the last legislative session, would have provided that "all revenue generated or determined by local school district tax millage must be preserved for use by school districts for school purposes." S. 1232, H. 4741 (2000).

I therefore respectfully dissent from that part of the majority opinion which may be read to require an allocation to a school district, subject to an abuse of discretion standard. I concur in the remainder of the decision.