633 S.E.2d 482

**William Mack BURRISS, E. Lee McPherson, and Anderson County School District Five, Appellants,**

v.

**ANDERSON COUNTY BOARD OF EDUCATION, Governor of the State of South Carolina, Lieutenant Governor of the State of South Carolina, and Speaker of the South Carolina House of Representatives, Respondents.**

No. 26175.

Supreme Court of South Carolina.

Heard May 2, 2006.

Decided June 26, 2006.

Rehearing Denied July 20, 2006.

---

444

Kenneth L. Childs, William F. Halligan, John M. Reagle, and Keith R. Powell, all of Childs & Halligan, P.A., of Columbia, for Appellants.

Michael J. Giese and Seann Gray Tzouvelekas, both of Leatherwood, Walker, Todd, & Mann, of Greenville, for Respondent Anderson County Board of Education.

Attorney General Henry Dargan McMaster and Assistant Deputy Attorney General J. Emory Smith, Jr., both of Columbia, for Respondents Governor of the State of South Carolina, Lieutenant Governor of the State of South Carolina, and Speaker of the South Carolina House of Representatives.

Justice WALLER:

This is a direct appeal from the circuit court's decision in favor of respondents on cross-motions for summary judgment. At issue is whether Anderson County's two-tiered school governance system violates the Equal Protection clause of the federal constitution and the South Carolina Constitution's guarantees of no taxation without representation and uniform taxation within a jurisdiction. Essentially, appellants argue

that these violations stem from the Anderson County Board of Education's review authority over the individual districts' budgets. We affirm.

## FACTS

Anderson County has five public school districts each with a popularly elected board of trustees.[1] There is also an Anderson County Board of Education ("the County Board") composed of nine members popularly elected by single member districts. Each member of the County Board represents approximately 18,739 Anderson County citizens. Anderson County School District Five ·("District Five") represents 42% of the total voting age population (VAP) for the County Board's nine seats. Seats 7 and 8 on the County Board are exclusively elected by citizens in District Five; for Seat 9, 97% of those voting reside in District Five. Citizens in District Five also vote for Seats 4, 5, and 6, representing 31%, 25%, and 28%, respectively, of those voting for these seats. For Seat 1, 99% of those voting reside in Anderson County School District Four.

The annual budget for each school district is developed through an interactive process between the individual districts and the County Board; however, the County Board exercises review and approval authority over each of the school districts' budgets. Ultimately, it is the County Board that sets the school operations tax millage rates for each school district.[2]

The County Board's budgetary review authority dates at least as far back as 1950. *See* 1950 S.C. Acts 868, § 38.[3] This authority over the budget was referenced again in 1982 when the Legislature provided that:

1. Anderson County School District Two extends into a part of Greenville County.

2. This is not a situation unique to Anderson County. According to the Anderson County Administrator, 46 of South Carolina's school districts must "go to a higher body (legislative delegation, county council, or county board) to get their budgets approved, or to raise the millage beyond a certain point," while 23 South Carolina school districts are "independent."

3. This section of Act 868 provides that the district Board of Trustees "shall certify to the County Board the amount of levy upon the taxable property in its district which ... is necessary ... for the proper

the Anderson County Board of Education shall be vested with the power to review and approve the budget of the school districts and shall further be vested with the power to review and approve requests by the school districts for any increase or decrease in taxation or millage in keeping with the needs of each school district and the requirements of the ... Education Finance Act.

1982 S.C. Acts 510, § 9. That same year, another Act authorized an advisory referendum in Anderson County to determine if the electors of the County favored an elected County Board of Education with review authority over the local elected school district boards' budgets. 1982 S.C. Acts 511, § 1. The voters overwhelmingly endorsed the County Board's review authority.[4]

Nevertheless, the County Board has not often exercised its authority over the individual districts' budgets, but instead has generally approved the budgets submitted by the districts. From 1997–2002, a total of 29 budgets were submitted to the County Board by the five school districts, and the County Board approved 28 of them. However, the County Board did not approve District Five's proposed budget for the 2001–2002 school year. This proposed budget, which had been approved by District Five's Board of Trustees, was in the amount of $63,274,082. The County Board ultimately reduced District Five's 2001–2002 budget by $750,000. Eight of the nine County Board members voted for this reduction.

In addition to its budgetary review function, the County Board also serves other functions. For example, the County operates and finances an Alternative School that is open to any child in Anderson County. The Alternative School is designed to serve students with special needs such as chronic

operation of the schools" and then "[u]pon the County Board approving such levy ... [the] Board shall notify the auditor of [Anderson] county the amount of such levy for such school district." The Act further provides that if any individual school district "fails to certify the amount of such levy," the County Board "shall determine the amount of such levy for such school district and notify the Auditor." 1950 S.C. Acts 868, § 38.

4. The results of the referendum were that 69 of the County's 74 precincts (93% of the precincts) voted yes.

discipline and truancy problems. District Five students attend the County-run Alternative School.

The County Board also administers the following programs: (1) food service programs to Districts One, Two, Three, and Four; (2) mental health counseling to students in Districts One, Two, Three, and Four, as well as the Alternative School; and (3) attendance monitoring and dropout prevention services to students in Districts One, Two, Three, and Four, and the Alternative School. Although these programs are not administered to District Five, it appears from the Record on Appeal this is because the District has opted to provide its own district-run programs.[5]

Finally, the County Board administers the county-wide equalization tax. This equalization tax, in practice, amounts to a levy of 14.7 mills which is imposed and collected uniformly on the County's assessed value and is then distributed by the County Board to the local districts based upon student average daily membership. According to the County Board's Administrator, the equalization tax is a "county-wide effort to spread the County's wealth in an effort to see that per pupil spending does not vary too dramatically from district to district."[6]

Other than their involvement with the County Board in the budget process, the five local school districts are generally autonomous in other areas of school governance, such as the hiring and firing of teachers, setting guidelines for student discipline, and creating extracurricular student activities. The school districts perform these functions without interference from, or supervision by, the County Board.

Appellant William Mack Burriss is the chairman of the Anderson County School District Five Board of Trustees, and

---

5. For example, the brochure describing the County Board's mental health program indicates it is open to District Five. District Five, however, had its own pre-existing program to provide therapeutic services to students. Furthermore, District Five provides its own attendance and school food service programs.

6. Appellants do not oppose the formula or the purpose of the equalization tax. Appellants do, however, assert that District Five is a "net donor" in this equalization scheme. The County Board, on the other hand, claims that District Five received more in equalization revenue than it paid in equalization taxes.

he resides in District Five. Appellant E. Lee McPherson is the chairman of the Anderson County School District Four Board of Trustees, and he resides in District Four. District Five itself is the third appellant in this case. In 2002, these appellants brought a declaratory action in circuit court against the County Board, as well as the following "State" respondents: the Governor, the Lieutenant Governor, and the Speaker of the House of Representatives.

Appellants and the County Board subsequently filed cross-motions for summary judgment. In April 2004, the circuit court granted the County Board's summary judgment motion and dismissed the complaint as to the County Board and the State respondents. The circuit court found that the statutory scheme giving the County Board review authority over District Five's budget was constitutional. The circuit court further ruled that Anderson County's two-tiered governance system did not violate the South Carolina Constitution's bans against: (1) taxation without representation; and (2) non-uniform taxation. *See* S.C. Const. Art. X, §§ 5 & 6.

## ISSUES

I. Did the circuit court err in finding that the statutory scheme giving the County Board budget review authority over the districts is constitutional under the Equal Protection Clause of the United States Constitution?

II. Did the circuit court err in ruling that the County Board's tax authority over the individual school districts does not violate the South Carolina Constitution's ban against taxation without representation, pursuant to Article X, Section 5?

III. Did the circuit court err in ruling that the County Board's tax authority over the individual school districts does not violate the South Carolina Constitution's ban against non-uniform taxation within a jurisdiction, pursuant to Article X, Section 6?

## DISCUSSION

### I. Equal Protection

Appellants argue that Anderson County's two-tiered school governance system creates an "over-inclusive franchise" which

dilutes the voting rights of those residing in District Four and Five. Specifically, appellants contend that because the budgets and tax rates for these districts are ultimately determined by the County Board, which contains members who are elected by voters who live outside Districts Four and Five, the strength of their own votes is diluted. Appellants assert that this vote dilution runs afoul of the federal Equal Protection Clause's [7] principle of "one person, one vote." We disagree.

■ This Court reviews the grant of a summary judgment motion under the same standard as the trial court pursuant to Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *E.g., Dawkins v. Fields,* 354 S.C. 58, 69, 580 S.E.2d 433, 438–39 (2003).

■ Under the South Carolina Constitution, the Legislature is charged with "provid[ing] for the maintenance and support of a system of free public schools open to all children in the State." S.C. Const. art. XI, § 3. The Legislature "has wide discretion in determining how to go about accomplishing [this] duty." *Horry County Sch. Dist. v. Horry County,* 346 S.C. 621, 632, 552 S.E.2d 737, 743 (2001). Furthermore, "[a]ll statutes are presumed constitutional and will, if possible, be construed so as to render them valid." *Id.* at 631, 552 S.E.2d at 742.

■■ Without question, equal protection guarantees "one person, one vote." *Gray v. Sanders,* 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The United States Supreme Court has recognized that an absolute ban on the franchise is not the only way a citizen's voting right can be abridged: "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Indeed, "vote dilution is as nefarious as an outright prohibition on voting." *Duncan v. Coffee County, Tenn.,* 69 F.3d 88, 93 (6th Cir.1995).

---

7. U.S. Const. amend. XIV, § 1.

■ Nonetheless, in the local government context, "normal public policy making" of the State can include expanding the franchise beyond the **required** electorate provided no unconstitutional vote dilution results. *Id.* at 94. Moreover, the courts have observed that "overinclusiveness is less of a constitutional evil than underinclusiveness." *Sutton v. Escambia County Bd. of Educ.*, 809 F.2d 770, 775 (11th Cir.1987); *accord Duncan*, 69 F.3d at 98.[8]

The federal courts generally have applied rational basis review to evaluate this type of overinclusion, or expanded electorate, claim. For example, the Eleventh Circuit has stated that "[t]he party seeking to exclude ... residents from voting in the county school board elections has the burden of demonstrating that the application of the [State] statute ... is irrational or wholly irrelevant to the state's objective of electoral participation in the selection of county school board members." *Sutton*, 809 F.2d at 772; *see also* Duncan, 69 F.3d at 95 (discussing *Sutton* standard with approval). *But see Locklear v. North Carolina State Bd. of Elections*, 514 F.2d 1152 (4th Cir.1975) (applying compelling state interest standard).[9]

The federal courts have determined whether the State statute survives this rational basis standard by further inquiring whether the expanded electorate has a "substantial interest" in the operation of the relevant school system. *E.g., Duncan*, 69 F.3d at 95; *Phillips v. Andress*, 634 F.2d 947 (5th Cir.1981); *Creel v. Freeman*, 531 F.2d 286 (5th Cir.1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). Moreover, the Duncan court noted that four factors have emerged to determine substantial interest:

---

8. *See also* Richard Briffault, *Who Rules at Home?: One Person/One Vote and Local Governments*, 60 U. Chi. L. Rev 339, 396–400 (1993) (discussing "expanded electorate/overlapping jurisdiction" cases which involved claims that a State improperly extended the local franchise and thereby unconstitutionally diluted the primary local votes, but finding that most extensions of the franchise have been sustained).

9. The strict scrutiny test employed in the Fourth Circuit's *Locklear* decision has not been followed by any other circuit. *See Duncan*, 69 F.3d at 94 (rejecting the Fourth Circuit standard "to the extent it still governs"). Indeed, *Locklear* is recognized as "the exception." Briffault, 60 U. Chi. L.Rev. at 397 n. 232.

1. The degree to which one district is financing the other;
2. The voting strength of the non-resident voters;
3. The number of, or potential for, cross-over students; and
4. The existence of any joint programs.

*Duncan,* 69 F.3d at 96.

Nevertheless, the Sixth Circuit in Duncan observed that the substantial interest test has been difficult "to apply consistently," *id.* at 95, and the several federal cases have had divergent results. *Compare Duncan, Sutton,* and *Creel* (all finding that the city residents had a substantial interest in the operation of the county school system thereby justifying their votes in county school board elections) *with Hogencamp v. Lee County Bd. of Ed.,* 722 F.2d 720 (11th Cir.1984), *Phillips,* and *Locklear* (all holding that the city residents did not have a substantial interest in the operation of the county school system thereby diluting the voting strength of the other county residents). One commentator has noted the fact-specific nature of these cases:

> The overlapping school district disputes have generated an unusual series of local voting cases in which both the state's interest in structuring local governments and the primary local constituency's interest in avoiding dilution have been weighed and the disputes have been resolved through a fact-sensitive consideration of the extent of city involvement in county schools.

*Briffault,* 60 U. Chi. L.Rev. at 398.

■■ We concur with the majority of federal courts that have faced this issue the appropriate inquiry in an expanded electorate case is the rational basis test. Thus, to prevail, appellants must demonstrate that the State's decision to structure the Anderson County public education system as a two-tiered system which vests the County Board with review authority over the individual districts' budgets is irrational. *See Duncan,* 69 F.3d at 95; *Sutton,* 809 F.2d at 772. Moreover, this particular rational basis review appropriately focuses on whether the out-of-district voters have a substantial interest in the operation of the relevant school system. *See, e.g.,* Duncan, 69 F.3d at 95. Finally, because of the fact-intensive character of these cases, we note that while the

Duncan factors often may be useful for the inquiry, they are not the exclusive factors to be taken into consideration. We do, however, begin our analysis with the Duncan factors.

### 1. The degree to which one district is financing the other

Appellants argue this factor weighs in their favor since they claim Districts Four and Five are net donor districts. However, appellants also argue that even if these Districts are net recipient districts, the amount is negligible when compared to the districts' overall budgets, and therefore, would not weigh in favor of finding a substantial interest for the "extraterritorial" voters.

The federal courts have often relied heavily on this factor. *See, e.g., Duncan,* 69 F.3d at 96 (finding that because the City provided a substantial amount from its own sales and property taxes to the County, and the funds made up a "sizable" portion of the recipient's budget (7.28%), the City votes were supported by a substantial interest); *Hogencamp,* 722 F.2d at 722 (finding that the City's contribution of money in the amount of 2.74% of the County board's budget did not support a finding of substantial interest). Yet, financial contribution is not determinative. *See Sutton,* 809 F.2d at 774 (where the facts did not show the City's financial participation in the County, but did establish a strong relationship between the two school systems, the court held that City residents had substantial interest in operation of County school system and could vote in county school board elections).

In the instant case, there is an equalization tax which, in effect, spreads the wealth in Anderson County among the individual districts. The equalization levy's goal is to create a financial in-flow to the districts that need more money, which necessarily will create an out-flow from wealthier districts. Moreover, because this levy represents a County-wide effort to distribute the County's wealth, and appellants do not object to the formula, it appears all the Anderson County districts participate in the financing of one another which, consequently, indicates that the out-of-district voters have a substantial interest in the other districts. We therefore agree with the circuit court's conclusion that the equalization tax justifies County Board's involvement with the districts' budgets.

## 2. The voting strength of the non-resident voters

Appellants argue that because District Four is served by only one County Board member, and District Five "only" has a controlling vote for three County Board seats, this factor weighs in their favor. Appellants further claim that because the County Board has review authority over each district, and out-of-district residents **collectively** have more County Board votes than the single district affected by the County Board's decision, this "control" amounts to unconstitutional vote dilution. We disagree.

The underlying premise of a representative government is that citizens vote for a representative and that person then represents his or her constituents in the governing body. However, appellants contend that because District Four and District Five are unable to attain majority control of the County Board, the County Board's taxation power is rendered unconstitutional. On the contrary, as the County Board points out, Districts Four and Five collectively wield significant influence in a County Board election, with both districts able to completely control **four** seats (out of nine) on the County Board, and District Five able to cast a substantial minority vote **in another three seats.** This factor clearly favors the County Board.

## 3. The number of, or potential for, cross-over students

The circuit court found that because the County's Alternative School serves students residing in all five school districts, "education in Anderson County is a collective undertaking and ... county-wide involvement is warranted." We agree that the Alternative School demonstrates that cross-over students exist in Anderson County. Because voters in all the districts have a substantial interest in this county-run school, this factor favors the County Board.

Appellants maintain, however, that there is no student crossover **between the school districts themselves,** and therefore this shows no substantial interest on the part of the "extraterritorial" voters. The basic flaw in appellant's argument is that these "out-of-district" voters are not voting for the district's own trustees, but rather for seats on the County Board. Hence, the relevant inquiry is whether **any** cross-over

students exist within the County, regardless of whether that is between the districts themselves or between a district and the County. Because there is some evident cross-over, this factor weighs in favor of the "extraterritorial" voters' substantial interest.

### 4. The existence of any joint programs

The circuit court found that the County Board administers programs related to mental health counseling, food services, attendance monitoring, and dropout prevention. Appellants, however, maintain there are no joint programs. Their argument relies on the facts that the County Board's programs are not joint vis-à-vis the districts and District Five does not receive these services.

We hold the circuit court correctly found that the County Board's programs regarding mental health counseling, food services, attendance monitoring, and dropout prevention are evidence in support of this factor. District Five apparently has **chosen** not to avail itself of any of these programs, but that should not weigh against the County Board or negate the programs' existence; these programs clearly affect the overwhelming majority of the school districts.

Moreover, it is undisputed that the Alternative School is run by the County Board and it serves students from all five districts. This is an additional joint program; the voters from all five districts clearly have a substantial interest in the County's operation of the Alternative School.

### 5. Other Relevant Factors

In addition to the four Duncan factors, the circuit court also noted "other county-wide interests that warrant county-wide involvement" in the individual school districts' budgets.[10]

The circuit court found that the County Board provided "a number of fiscal services for the districts" related to tax collection and distribution, including the equalization tax. The circuit court also noted the County Board's review authority over the budgets. Finally, the circuit court found that every

---

10. We note that these considerations, while not contemplated by the Duncan factors, are relevant to the rational basis inquiry because, as explained above, the inquiry into the constitutionality of an expanded electorate is highly fact-specific.

resident of a South Carolina county has a substantial interest in the education of the children of that particular county. In support of this latter finding, the circuit court cited the testimony of Dr. James Guthrie, a professor of public policy and education.

Dr. Guthrie, provided deposition testimony as an expert on behalf of the County Board. Dr. Guthrie stated that "[a]ll the residents of Anderson County hold the prospect of benefiting from the educational programs" in District Five because of what economists label "neighborhood" or "spillover" effects. In Dr. Guthrie's opinion, the closer one's proximity to someone in District Five, "the greater or more intense the likelihood that spillover effect" would pertain to that person.

Dr. Guthrie also testified that virtually every State he was familiar with, with the exception of Hawaii, had an intermediate government body between a State education department and a local school district; moreover, Dr. Guthrie stated that these intermediate bodies frequently have the authority to oversee the local school districts' budget. According to Dr. Guthrie, public policy supports the use of an intermediate body because it leads to "economy-of-scale," i.e., a more efficient use of "otherwise scarce resources." In addition, the intermediate body serves a regulatory function as an arm of the State. Dr. Guthrie explained that this is "a part of trying to balance remote, centralized state government with, presumably, local and locally sensitive and responsive local school boards" which he believed was "a reasonable activity."

We agree with the circuit court that in South Carolina it is not unreasonable for County residents to have a substantial interest in the education of other County residents, even if they reside in a different school district. Dr. Guthrie's "neighborhood effects" testimony amply supports this conclusion. Moreover, as recognized by the circuit court, "the county unit is an essential part of every South Carolinian's existence." *See* S.C. Const. art. VIII, § 7 (establishing Home Rule). The various financial functions performed by the County Board, including those ministerial functions related to the equalization levy, clearly are rationally related to the State's objective in giving counties home rule and also are reasonably consistent with the State's decision to give the County Board budgetary review authority.

In sum, we hold that the State's authorization of a popularly elected County school board with review authority over the individual Anderson County school districts' budgets is neither "irrational" nor "wholly irrelevant" to the State's goals in efficiently providing public education. *Sutton,* 809 F.2d at 772. As the United States Supreme Court has noted, "[t]he Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems." *Avery v. Midland County,* 390 U.S. 474, 485, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Furthermore, the Constitution should not be a "roadblock[] in the path of innovation, experiment, and development among units of local government." *Id.* The State's establishment of the two-tiered school governance in Anderson County does not result in vote dilution and therefore does not offend the Equal Protection's guarantee of "one person, one vote." Accordingly, we affirm the circuit court's ruling on this issue.

## II. No Taxation without Representation

■ Appellants next argue that because the County Board votes on an individual school district's budget and tax levy, yet the County Board does not directly, i.e. exclusively, represent just a single district, these tax decisions can never be "directly corrected by those who must carry the burden of the tax." *Crow v. McAlpine,* 277 S.C. 240, 245, 285 S.E.2d 355, 358 (1981). Appellants contend this violates Article X, Section 5 of the South Carolina Constitution. We are unpersuaded by appellants' argument.

The State Constitution provides that "[n]o tax, subsidy or charge shall be established, fixed, laid or levied, under any pretext whatsoever, without the consent of the people or their representatives lawfully assembled." S.C. Const. art. X, § 5. This Court has held that the Legislature cannot, "consistent with Article X, Section 5, delegate the unrestricted power of taxation" to a County school board composed exclusively of members **appointed** by the Governor. *Crow v. McAlpine,* 277 S.C. at 245, 285 S.E.2d at 358. The Court in *Crow v. McAlpine* stated that "[w]here the power is delegated to a body composed of persons not **assented to by the people** nor subject to the supervisory control of a body **chosen by the people,**" Article X, Section 5, is violated. *Id.* at 244, 285

S.E.2d at 358 (emphasis added). This Court has also noted that "[d]elegation of the taxing power should be kept with supervisory control always vested in elective bodies." *Bradley v. Cherokee Sch. Dist. No. One of Cherokee County,* 322 S.C. 181, 184, 470 S.E.2d 570, 571 (1996).

In the instant case, the taxation power at issue is vested in an elective body (the County Board) which is "chosen by the people" of Anderson County. Therefore, there is no violation Article X, Section 5 of the State constitution. *See Bradley; Crow v. McAlpine.*

The County Board consists of nine seats elected by single member districts representing approximately 18,739 Anderson County residents. The Legislature has authorized this popularly elected board with taxation authority. *See* 1982 S.C. Acts 510, § 9; 1950 S.C. Acts 868, § 38. Additionally, the people of Anderson County in the 1982 referendum overwhelmingly voted in favor of the County Board having review authority over the school districts' budgets. Finally, contrary to the appellants' assertions, "the power to fix and levy" Anderson County's school tax has been appropriately conferred upon the County Board, which indeed **is** "a body which stands as the direct representative of the people, [such] that an abuse of power may be directly corrected by those who must carry the burden of the tax." *Crow v. McAlpine,* 277 S.C. at 244–45, 285 S.E.2d at 358.

Regarding this issue, the circuit court stated the following: "The mere fact that voters in the individual school districts directly elect fewer than all of the Board members who make decisions affecting those districts does not subject those voters to taxation without representation." We agree and therefore affirm summary judgment on this issue as well.

### III. Uniform Taxation

██ Finally, Appellants argue that the County Board's review authority enables it to impose different tax levies on the five school districts in violation of the State Constitution's general rule against non-uniform taxation. *See* S.C. Const. art. X, § 6. We disagree.

Article X, section 6 of the South Carolina Constitution, entitled "Assessment and collection of taxes in political subdivisions," reads as follows, in pertinent part:

The General Assembly may vest the power of assessing and collecting taxes in all of the political subdivisions of the State. Property tax levies shall be uniform in respect to persons and property within the jurisdiction of the body imposing such taxes; provided, that on properties located in an area receiving special benefits from the taxes collected, special levies may be permitted by general law applicable to the same type of political subdivision throughout the State, and the General Assembly shall specify the precise condition under which such special levies shall be assessed.

*Id.*

Appellants maintain that because the County Board represents the political subdivision of the County, this constitutional provision prevents the County Board from making different assessments for the individual school districts which represent five different political subdivisions. The County Board, on the other hand, asserts that the provision's "special levies" exception to the uniformity requirement applies to the school districts because the districts receive the "special benefits" from the school taxes. Specifically, the County Board argues that several state statutes establish the applicability of this exception, including S.C.Code Section 4–9–70, the Education Finance Act of 1977 ("EFA"), and the Education Improvement Act ("EIA").[11]

Section 4–9–70, which is part of the Home Rule Act, states that "the county council shall determine by ordinance the method of establishing the school tax millage **except in those cases where** boards of trustees of the districts or **the county board of education established such millage at the time ... this chapter becomes effective.**" S.C.Code Ann. § 4–9–70 (1976) (emphasis added). This Court discussed the legislative intent of section 4–9–70 in *Stone v. Traynham,* 278 S.C. 407, 297 S.E.2d 420 (1982):

By enacting § 4–9–70, the General Assembly attempted to insure that the taxing power for all school districts would be properly vested in some authority. The clear intent is to

---

11. *See* S.C.Code Ann. § 59–20–10 *et seq.* (2004) (EFA); S.C.Code Ann. § 59–21–1030 (2004) (EIA). These statutes, *inter alia,* set minimums for local school district funding via formulas calculated annually.

vest the power to determine the school tax levy in county council in all cases **where it is not vested elsewhere.** *Id.* at 410, 297 S.E.2d at 422 (emphasis added). This statute went into effect in 1975, well after the County Board had been authorized to set the school tax millage. *See* 1950 S.C. Acts 868, § 38.[12]

Based on this Court's statement on Section 4–9–70's intent in *Stone v. Traynham,* it is clear the Legislature envisioned that the County Board would set different millage rates for the individual Anderson County school districts. Furthermore, we agree with the County Board that both the EFA and the EIA inherently contemplate that millage rates will vary among school districts within a single county. *See, e.g.,* S.C.Code Ann. § 59–20–30(6) (stating that one of the legislative purposes of the statute is to require **each** local school district "to contribute its fair share" relative to its "taxpaying ability"); S.C.Code Ann. § 59–21–1030 (local financial effort adjusted annually by inflation factor). Given that these several statutes support the County Board's argument that the special levies exception of Article X, Section 6 applies to school taxes, we affirm the circuit court's summary judgment ruling on this issue.

## CONCLUSION

For the reasons discussed above, the circuit court's decision to grant the County Board's summary judgment motion and to dismiss the complaint against **all** respondents is

**AFFIRMED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.

---

12. Appellants assert that 1966 S.C. Acts 1080 establishes that the County Board did not have authority to set the school millage in 1975. The 1966 Act provided that the Anderson County school districts could not increase the tax levy more than five mills in a year without a referendum. We agree with the County Board that this legislative act simply set a maximum millage increase but did not affect the County Board's **review authority** which was established as early as 1950 and has been subsequently referenced by the Legislature. *See* 1950 S.C. Acts 868, § 38; 1982 S.C. Acts 510, § 9; *see also* 1989 S.C. Acts 269, § 1(B) (stating that the districts shall annually "recommend" to the County Board the amount of tax millage needed for the budget).