656 S.E.2d 20

**Harry MONTGOMERY, Respondent**

v.

**CSX TRANSPORTATION, INC., Petitioner.**

**No. 26411.**

Supreme Court of South Carolina.

Heard Oct. 18, 2007.

Decided Jan. 7, 2008.

38

Mark C. Wilby and Amy R. Snell, of Fulcher Hagler, LLP, of Augusta, GA, for Petitioner.

Robert A. McKenzie, of McDonald, McKenzie, Rubin, Miller & Lybrand, of Columbia, and W.C. Tucker, Jr., of Lucas, Petway, Tucker, and Wash, PC, of Birmingham, AL, for Respondent.

Justice WALLER:

We granted petitioner's request for a writ of certiorari to review the Court of Appeals' opinion in *Montgomery v. CSX Transp., Inc.*, 362 S.C. 529, 608 S.E.2d 440 (Ct.App.2004). We affirm as modified.

## PROCEDURAL BACKGROUND

Respondent Harry Montgomery, a railroad employee of petitioner CSX Transportation, Inc. (CSX), was injured while using a manual track wrench to tighten a bolt on a railroad track. Respondent brought a negligence action against CSX under the Federal Employers' Liability Act (FELA).[1] CSX moved for summary judgment. The evidence presented included deposition testimony of respondent and two of his CSX supervisors, as well as affidavits from two experts for respondent. After a hearing, the trial court granted CSX's motion. On appeal, the Court of Appeals reversed and remanded for trial; Judge Goolsby dissented.

## FACTS

Respondent was injured on July 13, 1999. At that time, he was employed as a track inspector and had been working for CSX for over 22 years. He attained the title of foreman in 1994.

---

1. 45 U.S.C. § 51 *et seq.* (2000).

CSX owns and operates two mainline tracks north of Charleston: the "A-line" and the "S-line." The A-line is made of "welded rail," which is continuous, quarter-mile rail sections welded together. There are "connected joints" on the A-line which means that bolts are put in place temporarily to hold the quarter-mile sections together, but those are later removed by a welding process. The S-line, on the other hand, is made up of "jointed rail" which is comprised of 39–foot rail sections held together by "rail joints." In one mile, there are approximately 130 joints on each rail, with six track bolts per joint. Given that there are two rails on a track, there are about 1,560 track bolts per mile on the S-line. The upshot is that there are many more track bolts on the S-line, and comparatively very few on the A-line.

Additionally, the A-line is a higher class line which handles more active railroad traffic. About 16 trains run per day on the A-line, which includes a high-speed passenger train, while the S-line runs only six trains per day, all local freight trains.

For both the A-line and the S-line, there were two track inspectors—respondent and a man named Ussery who had worked for CSX for two years. Respondent's immediate supervisor was roadmaster James Reed; Darrell Crook was CSX's assistant division engineer and Reed's supervisor.

Respondent explained that a track inspector's "main purpose is to look for anything that's unsafe and try to make it safe." He further described his track duties as including the following: tightening and replacing track bolts, replacing broken joints and joint bars, and replacing anything else that might be broken or defective on the track. In addition, he was responsible for reporting anything "out of the ordinary that would allow a piece of track to be unsafe."

According to respondent, about a month before his injury, Crook reassigned him from working primarily on the A-line to working **solely** on the S-line:

Mr. Crook came up to me and Mr. Crook made a verbal agreement with me and he says that a—that S Line was in bad shape and that he knew it and I knew it and he came up to me and he made a verbal agreement with me, he says that, "If I were to get you a piece of machinery called a bolt machine and put you out on this track, would you be able to

do some work to get that track a little better—in better shape?" And I agreed to, I said, "Look, Mr. Crook, I'll do the best that I can," and that's all I could have done.

A bolt machine is a machine that loosens and tightens track bolts and is used instead of a manual track wrench. Respondent explained that although he was provided with a bolt machine on the first day of his reassignment, the machine was old and it failed. It was neither fixed nor replaced. However, the other track inspector, Ussery, who had been assigned to the A-line, had been provided with a state-of-the-art Matweld Unit which was a power hydraulic system. Among other things, this unit can run power wrenches and a bolt tightening machine.

Respondent was responsible for the "Andrews Subdivision" of the S-line, approximately 45 to 50 miles of track. In his deposition testimony, respondent stated that although he would have preferred to work on the A-line, he felt as if his job would be in danger if he had not taken the S-line assignment from Crook. Respondent explained about the poor condition of the S-line as follows:

[The] railroad track was tore up and run down for many years and you had to be there to see it. It was—it was a bad railroad track. It was a bad piece of track. It was rough, it was rugged, there was a lot of work. I mean a whole lot more work to have been done on that piece of railroad track than it was on the A Line.

Because of the S-line's poor condition, a lot of "slow orders" were placed on the S-line. In addition, respondent stated there was "talk among employees" that the S-line might have to be shut down because the "tracks were in bad shape."

Although he believed that the job assignment required more than just one man, respondent worked without a crew on the S-line. On the day of the accident, respondent went out and was tightening loose bolts and replacing missing bolts. He was supposed to go as far on the line as his workday hours would allow. After about three and a half hours of working, respondent estimated he had tightened 100 to 200 bolts. As respondent was attempting to tighten a particular bolt on a switch with the manual track wrench, the bolt "froze;" after respondent applied "a little more pressure than normal" to the

bolt, it gave way which caused respondent to be thrown across the rail and injured on his right side.[2]

Respondent did not claim there was any defect with the manual track wrench, a tool he had used his entire career at CSX. He did state that the bolt was "bad," i.e., faulty in some way. As to whether he could have gotten help if he had called for it, respondent stated it was "very doubtful" he would have gotten any, especially given the shortage of employees at the rail yard during that time.

Respondent's roadmaster, Reed, testified in deposition that he would expect a track man to tighten up to 24 bolts in a normal day's work. He further stated that if he knew an employee would be tightening as many as 100 bolts in a day, then he would give him a bolt tightening machine for the work.[3] Reed confirmed that respondent had not been charged with any violation of any rule.

Crook, the assistant division engineer, testified that he did not remember a conversation with respondent where Crook asked respondent to get the S-line in better shape with a bolt machine. Crook acknowledged, however, that the S-line "had a lot of problems that . . . needed to get corrected," such as "a lot of bolts out, . . . broken bars . . ., a good many weak ties and . . . some surface conditions."

Respondent presented two expert affidavits. Don H. Bowden, Sr., a railroad safety consultant and former roadmaster for CSX, offered his opinions regarding reasonable work assignments and safety practices in the railroad industry. In Bowden's opinion, respondent's assignment on the S-line should not have been done by one worker alone:

Under common industry practice, this job should not be done by one man alone. [Respondent] was assigned to the monumental task of repairing the track by himself. While it is not uncommon for one man to be assigned a task in inspecting a track, it is unreasonably hazardous to require one man to not only inspect the track, but also perform the

2. As a result of the injuries, Montgomery had neck surgery and knee surgery.

3. However, Reed also stated he did not agree that it was inappropriate to put one man on a track to tighten 150 bolts in one day.

actual track maintenance himself. A prudent and reasonable railroad would assign a gang of men to do this type of job. To do otherwise, in my opinion, subjects the employee to an unsafe workplace in the railroad industry because an accident is bound to happen.

Bowden also opined it was unreasonable for CSX to provide respondent with only a manual track wrench:

The unreasonable hazards to which [respondent] was exposed by working this track by himself were greatly exacerbated and increased by CSX requiring him to replace and/or tighten the track bolts with a manual track wrench. While it is not uncommon for workers to use manual track wrenches to tighten sporadic loose bolts on a stretch of track, this particular track was in such a state of disrepair that the use of a track wrench was not only impracticable, it unreasonably increased the likelihood of injury to [respondent].... In addition to the sheer volume of bolts that [respondent] needed to replace and/or tighten, the condition of the bolts and the track also made the manual track wrench an unsuitable tool for this job. This track had been neglected by CSX for a long period of time. As such, CSX should have known that the bolts were very likely to be "rusted-on," making them very difficult to remove and/or tighten. Requiring Mr. Montgomery to work with a manual wrench in these conditions unreasonably multiplied his risk of injury. Mr. Montgomery's description of the accident shows these hazards were present because he was required to use a tremendous amount of leverage on the wrench to break through the rust. For all of these reasons, a prudent and reasonable railroad would not have supplied just a track wrench to Mr. Montgomery to do this job. A prudent and reasonable railroad would have provided him with another bolt tightening machine when the first one became inoperable or would have fixed the one assigned to him.

Respondent also offered the affidavit of Dr. Tyler A. Kress, a biomechanical engineer, who stated as follows:

It is my opinion that (1) the type of work [respondent] was performing daily and (2) the tools he was given to perform that work created unreasonably dangerous biomechanical risk factors to his body. It is my further opinion that these

risk factors are consistent with his fall and the injuries he sustained as a result of his fall.

Apparently, [respondent] was ordered to perform the repetitive motion of tightening and untightening bolts with a manual track wrench. Proper use of the track wrench requires the employee to keep the head of the wrench fixed on the nut that is being tightened or untightened. Keeping the head of the wrench on the nut is even more important when the bolts and nuts are rusted and susceptible to being "stuck." Sporadic use of the track wrench to tighten and untighten nuts and bolts would not normally cause risk to the human body. However, performing repetitive tasks daily—and specifically ones that require push/pull forces of the upper extremity and upper body like the track wrench— are widely associated with increased risk of injury because of the cumulative effects of the repetition and fatigue. In [respondent's] work environment, his use of the track wrench was not spora[d]ic because of the sheer number of bolts that were evidentially [sic] in disrepair on this stretch of track. His fatigue from this manual, repetitive motion was increased by the increased forces needed to free the nuts and bolts from their rusted condition. With each repetitive use of the wrench, it became more physically difficult for [respondent] to control the wrench and its pivot point where the head is fastened to the nut. The probabilities of both (1) the wrench slipping off of the nut and (2) an abrupt motion occurring because of a nut breaking free are increased significantly due to the repetitive and tiring nature of the assigned job. It is understandable that [respondent] may fall if and when one of these events occur. Therefore, it is my opinion that his fall is a natural result of the work environment imposed on him by C.S.X.

The trial court found the expert affidavits unpersuasive because respondent was not under any time pressure by CSX to complete the S-line work. Furthermore, the trial court reasoned that respondent's task of tightening the track bolt was one that could be safely performed by one person; therefore, additional workers would have only meant the job would be finished more quickly. The trial court also found that the failure to provide a bolt tightening machine was not automatically negligent. Significantly, the trial court noted that "[i]f

the use of the manual bolt wrench was safe and appropriate for use on one bolt, then it was safe and appropriate for any number of bolts absent unreasonable performance requirements imposed by" CSX. Since the wrench itself was not defective and respondent was "not on any schedule," the trial court found no genuine issue of material fact as to CSX's negligence.

As stated above, the Court of Appeals reversed, with Judge Goolsby dissenting. The majority opinion held that respondent had established genuine issues of material fact as to whether: (1) CSX failed to provide respondent with sufficient help to repair the S-line; and (2) CSX breached its duty to provide respondent with safe and suitable equipment to do his job. The Court of Appeals further held that the railroad employer's conduct must be viewed as a whole, and since CSX's alleged breaches could be combined to create an unreasonably unsafe work environment, then negligence should be determined by a jury. Thus, the Court of Appeals reversed summary judgment and remanded the case for a jury trial. *Montgomery v. CSX Transp., Inc., supra.*

## ISSUES

1. Did the Court of Appeals err in announcing a relaxed standard of negligence for a FELA action?

2. Did the Court of Appeals err in finding the expert affidavits sufficiently created a genuine issue of material fact as to CSX's negligence?

3. Did the Court of Appeals err in holding that, pursuant to *Blair v. Baltimore & Ohio R.R.,* 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490 (1945), the combined effect of respondent's two negligence theories sufficiently raised an inference as to FELA negligence?

## DISCUSSION

The ultimate issue in the instant case is whether the Court of Appeals erred in reversing the grant of summary judgment. Because this overall question permeates the three discrete legal issues on certiorari, we begin our discussion with general

FELA law, including the legal standards governing summary judgment review in a FELA case.

■ To prevail on a FELA claim, the plaintiff must prove the "traditional common law elements of negligence (i.e., duty, breach, causation and damages) and that the employer's negligence 'contributed, in whole or in part, to the worker's injury.'" *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 369 n. 5, 635 S.E.2d 97, 101 n. 5 (2006) (quoting *Rogers v. Norfolk S. Corp.*, 356 S.C. 85, 93, 588 S.E.2d 87, 91 (2003)).

In *Norton v. Norfolk S. Ry. Co.*, 350 S.C. 473, 476, 567 S.E.2d 851, 853 (2002), we stated the following regarding FELA claims in state court:

FELA is a federal statute which provides the framework for handling the injury claims of federal railroad workers. State courts have concurrent jurisdiction to hear FELA claims. . . . A FELA action brought in state court is controlled by federal substantive law and state procedural law. However, a form of practice may not defeat a federal right. . . . It is firmly established that questions of sufficiency of evidence for the jury in cases arising under FELA in state courts are to be determined by federal rules.

(Citations omitted).

■ This Court reviews the grant of a summary judgment motion under the same standard as the trial court, pursuant to Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *E.g.*, *Burriss v. Anderson County Bd. of Educ.*, 369 S.C. 443, 633 S.E.2d 482 (2006); *Dawkins v. Fields*, 354 S.C. 58, 580 S.E.2d 433 (2003). When determining if any triable issues of fact exist, the evidence and all inferences which can be reasonably drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Wilson v. Style Crest Products, Inc.*, 367 S.C. 653, 656, 627 S.E.2d 733, 735 (2006). Moreover, even if there is no dispute regarding the evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied. *Id.*

### 1. *Did the Court of Appeals misstate the FELA standard of negligence?*

CSX argues the Court of Appeals erred in finding there is a "relaxed" standard for proving FELA negligence, and by applying the relaxed standard it improperly found issues of fact. CSX specifically contends that although there is a relaxed standard for the causation prong, the Court of Appeals erroneously found the relaxed standard also applies to the duty/breach element.[1] We agree with CSX that the Court of Appeals' language regarding the FELA standards is problematic. We do not agree, however, that the misstatements in the opinion led to the wrong result.

■■ Section 1 of FELA provides that:

Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting **in whole or in part** from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (emphasis added). Courts must construe FELA provisions liberally in favor of injured railroad workers. *E.g., Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994); *Urie v. Thompson*, 337 U.S. 163, 182, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Put simply, FELA imposes upon a railroad a non-delegable duty to provide its employees with a reasonably safe place to work. *E.g., Brown v. CSX Transp., Inc.*, 18 F.3d 245, 249 (4th Cir.1994); *Rogers v. Norfolk S. Corp.*, 356 S.C. 85, 92, 588 S.E.2d 87, 90 (2003), *cert. denied*, 541 U.S. 1085, 124 S.Ct. 2812, 159 L.Ed.2d 246 (2004).

In *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the United States Supreme Court (USSC) stated the following regarding causation in a FELA case:

---

4.   The elements of duty and breach in a negligence action are sometimes collectively referred to as the negligence (or fault) prong.

It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes. . . . Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played **any part at all** in the injury or death.

*Id.* at 506–07, 77 S.Ct. 443 (emphasis added, footnote omitted).

More recently, the USSC characterized Rogers as having established a "relaxed" causation standard:

[W]e held in *Rogers* [ ] that **a relaxed standard of causation** applies under FELA. We stated that "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, **even the slightest,** in producing the injury or death for which damages are sought." [*Rogers,* 352 U.S.] at 506, 77 S.Ct. 443.

*Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) (emphasis added).

Nonetheless, the *Gottshall* Court also emphasized that FELA is not a workers' compensation scheme and " 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur.' " *Id.* (quoting *Ellis v. Union Pacific R. Co.,* 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947)).

There is a federal circuit split as to whether the relaxed FELA standard applies only to causation, or applies to the fault prong of FELA negligence as well. The Fifth Circuit, for example, expressly uses the lower standard only on the causation element. *See, e.g., Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir.1997) (*en banc*). The *Gautreaux* court stated that the "in whole or in part" language of the FELA statute "modifies only the causation prong of the inquiry. The phrase does not also modify the word 'negligence.' " *Id.* at 335. The Second Circuit, however, applies the relaxed standard to both the fault and the causation prongs. *See, e.g., Williams v. Long Island R.R. Co.,* 196 F.3d 402, 406 (2nd Cir.1999) (where the court noted it has "explicitly stated" it construes FELA "as creating a relaxed standard

for negligence as well as causation") (citation and internal quotation marks omitted).

The Fourth Circuit has noted that a Jones Act claim, like a FELA claim, is based on negligence where "the elements of duty, breach, and injury draw on common law principles" and only "the element of causation is relaxed." *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 437 (4th Cir. 1999).[5]

The confusion on this issue was clearly evidenced very recently in *Norfolk Southern Ry. Co. v. Sorrell*, —— U.S. ——, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007). There, the USSC accepted the question of whether the Missouri courts erred in determining that the causation standard for employee **contributory negligence** under FELA differs from the causation standard for railroad **negligence**. The USSC answered this question in the affirmative, and held that under FELA, the same causation standard applies to both a plaintiff's claim for negligence and a defendant's affirmative defense of contributory negligence.

Yet, the *Sorrell* Court did not establish precisely what the FELA standard for causation is. Although the railroad had "attempted to expand the question presented to encompass **what** the standard of causation under FELA should be, not simply whether the standard should be the same for railroad negligence and employee contributory negligence," the Court declined to answer that question. *Id.* at 803–04 (emphasis in original). The majority opinion therefore did not address this issue of a relaxed standard.

In a concurring opinion, however, Justice Souter offered his own characterization of the 1957 *Rogers* opinion: "*Rogers* did not address, much less alter, existing law governing the degree of causation necessary for redressing negligence as the cause of negligently inflicted harm; the case merely instructed courts how to proceed when there are multiple cognizable causes of an injury." *Id.* at 809–10 (Souter, J., concurring).

---

**5.** *But see Estate of Larkins v. Farrell Lines, Inc.*, 806 F.2d 510, 512 (4th Cir. 1986), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987) (where the Fourth Circuit stated that FELA "creates a light burden of proof **on negligence and causation**") (emphasis added).

Justice Ginsburg also wrote separately in *Sorrell*, but she believed the majority opinion "leaves in place precedent solidly establishing that the causation standard in FELA actions is more 'relaxed' than in tort litigation generally." *Id.* at 812 (Ginsburg, J., concurring in judgment). According to Justice Ginsburg, "*Rogers* describes the test for proximate causation applicable in FELA suits. That test is whether 'employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" *Id.* at 813 (quoting *Rogers*, 352 U.S. at 506, 77 S.Ct. 443).

We turn now to the instant case and how the Court of Appeals set out the FELA standards. The Court of Appeals stated as follows:

A plaintiff's burden in a FELA action is significantly lighter than it would be in an ordinary South Carolina common law negligence case:

[FELA's] [history] has been said to reduce the extent of the negligence required, as well as the quantum of proof necessary to establish it, to the "vanishing point." **While it is still undoubtedly true that there must be some shreds of proof both of negligence and of causation,** and that "speculation, conjecture and possibilities" will not be enough, there appears to be little doubt that under [FELA] jury verdicts for the plaintiff can be sustained upon evidence which would not be sufficient in the ordinary negligence action.

*Norton v. Norfolk S. Ry. Co.*, 341 S.C. 165, 533 S.E.2d 608 (Ct.App.2000), *rev'd on other grounds,* 350 S.C. 473, 567 S.E.2d 851 (2002) (citing W. Page Keeton et al., *Prosser & Keeton on Torts* § 80, at 578 (5th ed. 1984)) (internal quotations omitted).

*Montgomery v. CSX Transp., Inc.*, 362 S.C. at 544–45, 608 S.E.2d at 448 (emphasis added).

However, in **this Court's** opinion which **reversed** the Court of Appeals' *Norton* case (albeit on other grounds), we noted that the Court of Appeals had "created a relaxed standard of negligence in federal law where there is not one, at least not in the Fourth Circuit." *Norton v. Norfolk S. Ry. Co.*, 350 S.C. at 480 n. 5, 567 S.E.2d at 855 n. 5.

■ Likewise, we find here the Court of Appeals inappropriately stated that a relaxed standard applies to the FELA negligence prong. Put simply, federal law has not conclusively established a relaxed standard of negligence (i.e., duty/breach) in FELA cases. *See Norton v. Norfolk S. Ry. Co.,* 350 S.C. at 476, 567 S.E.2d at 853 (a FELA action heard in state court is controlled by federal substantive law). Based on the USSC's statement in *Gottshall,* there is a relaxed **causation** standard, but the USSC has never expressly stated that anything other than the traditional federal common law standard applies to the other elements of a FELA claim.[6] Therefore, we agree with CSX that the Court of Appeals erred in lowering the burden of proof on the duty/breach elements of a FELA negligence claim.

We reiterate the general standard of proof in a FELA claim: the plaintiff must prove the traditional duty, breach, causation and damages elements of negligence. *Baggerly v. CSX Transp., Inc.,* 370 S.C. at 369 n. 5, 635 S.E.2d at 101 n. 5. We further hold that under federal law, there is a relaxed standard for the causation element. *See Gottshall, supra; Rogers, supra.* Accordingly, we **modify** the portion of the Court of Appeals' opinion which inaccurately states there is a "significantly lighter" burden of proof on both causation and negligence for a FELA claim. *Montgomery v. CSX Transp., Inc.,* 362 S.C. at 544–45, 608 S.E.2d at 448.

## 2. Did the Court of Appeals err in finding the expert affidavits created a genuine issue of material fact?

CSX next argues the Court of Appeals erred in finding that the expert affidavits created genuine issues of material fact. Specifically, CSX maintains the affidavits merely contain speculation and conclusory allegations and instead should have been based on specific facts in the record. We disagree.

Rule 56(e), SCRCP, provides that for purposes of summary judgment, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be

---

6. Although Justice Souter's concurring opinion in *Sorrell* has now clouded the issue on whether *Rogers* indeed relaxed the causation standard, the majority opinion did not speak to this precise issue. We therefore agree with Justice Ginsburg's assessment that *Sorrell* leaves both *Rogers* and *Gottshall* intact.

admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." This rule further states that "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), SCRCP.

CSX takes issue with the experts' assumptions regarding the following: (1) respondent's difficulty in turning the track bolt was due to the fact that the bolt was "rusted-on;" (2) respondent needed to use a "tremendous amount of leverage on the wrench;" and (3) respondent was fatigued because of the repetitive nature of his assignment. CSX contends that these averments lack factual support in the record.

Arguably, both experts made a few assumptions that are not explicitly supported by respondent's deposition testimony. For example, respondent never discussed rust on the bolts and did not say he suffered from fatigue. Moreover, his exact words regarding the leverage he used on the wrench—"I tried to tighten it some more, the bolt had froze, which allowed me to apply just a little more pressure than normal, and the whole thing gave which ... sent me across the rail"—did not unequivocally indicate he used "tremendous" leverage.

Nonetheless, the evidence must be construed in the light most favorable to respondent. *See, e.g., Wilson v. Style Crest Products, Inc.,* 367 S.C. at 656, 627 S.E.2d at 735. Respondent did testify he had already tightened between 100 and 200 bolts in less than four hours. In our opinion, a reasonable inference is that his job entailed repetitive motions with the large manual track wrench. Similarly, respondent was thrown across the rail when the previously stuck bolt "gave" way. We find a jury could reasonably infer that respondent was applying quite a bit of pressure to the bolt in an attempt to tighten it, which was exactly what his assignment entailed.

This Court has plainly stated that "even when there is no dispute as to the evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied." *Id.* There appears to be no real dispute to the following critical facts: respondent was working alone on the day of the accident, with a manual tool, on a 45–mile stretch of track that was in very poor condition. Respon-

dent's negligence theories are that CSX should have assigned more workers for the task **and/or** should have provided him with a bolt tightening machine. Both respondent's experts confirmed that, in their opinion, CSX should have done both of these things and the failure to do so was causally related to respondent's injury. Thus, there is evidence of duty, breach, causation and injury in respondent's favor. Obviously, the parties vehemently dispute the inferences and conclusions to be drawn from the undisputed facts, but that simply establishes that summary judgment is not appropriate in this case. *Id.*

### A. *Is there a jury question on whether CSX was negligent for failing to provide sufficient help to respondent for the S-line repair?*

FELA negligence may be predicated on the railroad's failure to furnish sufficient help if, but for that failure, the injury would not have occurred. *E.g., Yawn v. Southern Ry. Co.*, 591 F.2d 312, 315 (5th Cir.), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 304 (1979); *Deere v. Southern Pac. Co.*, 123 F.2d 438, 441 (9th Cir.1941), *cert. denied*, 315 U.S. 819, 62 S.Ct. 916, 86 L.Ed. 1217 (1942); *Lis v. Pennsylvania R.R. Co.*, 12 Misc.2d 868, 869, 173 N.Y.S.2d 132 (N.Y.City Ct.1958).

CSX argues that providing more workers on the S-line would not have prevented respondent's injury because tightening a bolt is generally a one-man task. CSX relies heavily on *McKennon v. CSX Transp., Inc.*, 897 F.Supp. 1024 (M.D.Tenn.), *aff'd*, 56 F.3d 64 (6th Cir.1995), in support of its argument that summary judgment is warranted in this case.

In *McKennon,* the plaintiff raised insufficient help as one of his negligence theories; the district court granted summary judgment for CSX. The plaintiff, a foreman, was repairing a railroad switch after a derailment. This was a two-man job where the plaintiff's partner would insert a tie under the tie plate and position the plate on top of the tie; the plaintiff would then secure the plate by driving a spike through it and into the tie. To drive the spikes, the plaintiff used a "spike maul," a nine-pound tool similar to a sledgehammer, which he had been using for approximately 20 years. While swinging the spike maul, the plaintiff injured his left shoulder. *Id.* at 1025–26.

As to the plaintiff's theory that he should have had more workers on the job, the district court stated the following:

> [T]he fact that Plaintiff's job would have been easier if there had been more workers does not constitute negligence on the part of Defendant, nor does it create an unreasonably unsafe work environment. Assuming *arguendo* that Defendant's failure to supply more workers was a breach of its duty, Plaintiff still has not shown how the absence of additional workers caused his injury.

*Id.* at 1027.

Admittedly, the facts of *McKennon* are very similar to those of the instant case, and it certainly is questionable whether CSX's failure to provide more workers on the S-line proximately caused respondent's injury. Respondent argues, however, the instant case is distinguishable from *McKennon*. Viewing the facts in a light most favorable to respondent and taking into account the relaxed standard of causation in a FELA case, we agree a jury question has been presented. Here, there are two experts who offered detailed affidavits as to CSX's duty, breach, and causation which was absent in *McKennon*.[7] Although the evidence on causation is not conclusive, the circumstances of this case require that the claim be submitted to a jury.

### B. *Is there a jury question on whether CSX was negligent for failing to provide respondent with a bolt-tightening machine?*

As to the theory regarding the bolt-tightening machine, CSX argues it was not required to provide respondent

---

7. The plaintiff in *McKennon* submitted an affidavit from his surgeon who concluded it was foreseeable that the plaintiff's shoulder would be injured from the task he was performing, and the plaintiff's assignment constituted an "unsafe work practice." The district court noted that "[t]his information constitute[d] the entire substance of the physician's affidavit" and was the only evidence in the record which supported the plaintiff's complaint. The district court concluded that affidavit did not create a genuine issue of material fact. *McKennon*, 897 F.Supp. at 1028 n. 2. The qualifications of the two experts in the instant case, and the more substantial content of their affidavits, contribute to making this case one in which there are genuine issues of material fact on the insufficient help negligence theory.

with an automated machine. We find, however, that respondent presented a jury question on this issue as well.

The proper inquiry in a FELA case is whether the work method prescribed by the employer was reasonably safe, not whether the employer could have used a safer alternative method for performing the task. *Stillman v. Norfolk & W. Ry.*, 811 F.2d 834, 838 (4th Cir.1987). Thus, the fact that there may have been an automated or safer method of work does not automatically render the chosen method negligent for purposes of FELA. *Chicago R.I. & Pac. R.R. v. Lint*, 217 F.2d 279, 282–83 (8th Cir.1954); *see also Soto v. Southern Pac. Transp.*, 644 F.2d 1147, 1148 (5th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 514, 70 L.Ed.2d 386 (1981) ("That there are other, arguably more advanced, methods in use by the defendant . . . is of no significance where the method in use by [the employee] was not an inherently unsafe one."); *McKennon*, 897 F.Supp. at 1027.

The plaintiff in *McKennon* argued that CSX was negligent for failing to provide an automated tool to drive in the spikes, but the district court decided, as a matter of law, there was no negligence: 

> Plaintiff admits that he has used the spike maul safely for twenty years. Plaintiff concedes that the maul he used was not defective in any way. He further concedes that the spike maul is a safe and appropriate way to drive spikes. . . . That easier, automated means were available is irrelevant to the issue in this case. Based on the Plaintiff's own testimony, this Court finds that Defendant's failure to allow the use of the machine did not constitute negligence or create an unreasonably unsafe working condition.

*McKennon*, 897 F.Supp. at 1027.

Once again, although the *McKennon* facts are similar to those of the instant case, we find *McKennon* distinguishable. In this case, respondent testified that when he was assigned to the S-line by Crook, he was, in essence, offered a bolt-tightening machine. That respondent's supervisor allegedly offered him an automated method to fix a track which was "in bad shape," is evidence that arguably CSX believed this was the appropriate way for respondent to handle the assignment. Thus, the facts that (1) the machine failed, (2) it was not fixed

or replaced, and (3) respondent was required to use the manual wrench, all weigh in favor of an inference that the manual method was not reasonably safe. *Stillman, supra.* This inference is supported by Reed's own testimony that he would expect a track man to tighten only up to 24 bolts in a normal day's work, and if he knew an employee would be tightening as many as 100 bolts in a day, he would give him a bolt tightening machine. Furthermore, respondent's experts both opined that a manual track wrench was fine for sporadic tightening, but was, in Bowden's words, "an unsuitable tool for this job."

Given this factual record, respondent has established there was a genuine issue of material fact as to whether CSX negligently failed to provide him a bolt-tightening machine. Thus, as the Court of Appeals found, a jury should decide the ultimate issue of whether the work method prescribed by CSX was reasonably safe. *See Stillman, supra.*

## 3. Did the Court of Appeals err in its application of Blair v. Baltimore & Ohio R.R., 323 U.S. 600 (1945)?

CSX argues that the Court of Appeals misinterpreted the USSC's decision in *Blair v. Baltimore & Ohio R.R.,* 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490 (1945). More specifically, CSX argues that because neither of respondent's negligence theories should, on its own, reach the jury, *Blair* may not be relied upon to send the case to the jury under a combined negligence theory. We disagree for two reasons.

First, as discussed above, it is our opinion respondent established there are jury questions presented as to his two theories of negligence even if considered independently. Second, we find no error in the Court of Appeals' application of *Blair.*

In *Blair,* the USSC stated that "[t]he duty of the employer becomes more imperative as the risk increases." *Id.* at 604, 65 S.Ct. 545 (citations and internal quotation marks omitted). Therefore, "[t]he negligence of the employer may be determined by viewing its conduct **as a whole.**" *Id.* (emphasis added). The USSC found this principle "especially . . . true" under the facts of *Blair* "where the several elements from which negligence might be inferred are so closely interwoven

as to form a single pattern, and where each imparts character to the others." *Id.* In addition, the USSC noted that "in close or doubtful" FELA cases, it was improper to deprive railroad workers of the benefit of a jury trial. *Id.* at 602, 65 S.Ct. 545.

The *Blair* Court then applied these rules to the facts:

The nature of the duty which the petitioner was commanded to undertake, the dangers of moving a greased, 1000 pound steel tube, 30 feet in length, on a 5 foot truck, the area over which that truck was compelled to be moved, the suitableness of the tools used in an extraordinary manner to accomplish a novel purpose, the number of men assigned to assist him, their experience in such work and their ability to perform the duties and the manner in which they performed those duties—**all of these raised questions appropriate for a jury to appraise in considering whether or not the injury was the result of negligence as alleged in the complaint.** We cannot say as a matter of law that the railroad complied with its duties in a reasonably careful manner under the circumstances here, nor that the conduct which the jury might have found to be negligent did not contribute to petitioner's injury 'in whole or in part.' Consequently we think the jury, and not the court should finally determine these issues.

*Id.* at 604–05, 65 S.Ct. 545 (emphasis added).

In the instant case, the Court of Appeals found that pursuant to *Blair*, respondent was entitled to a jury trial:

The *Blair* case is controlling here. To make [respondent] not only work on the entire Andrews Subdivision of the S-line by himself all day, every day, until completed, but also limiting his ability to make the numerous repairs by only providing him with a manual track wrench is *prima facie* evidence of negligence, if not negligence as a matter of law.

*Montgomery v. CSX Transp., Inc.*, 362 S.C. at 549, 608 S.E.2d at 451.[8]

---

8. Judge Goolsby disagreed with the majority's reading of *Blair*. In his opinion, "the [USSC in *Blair*] had already accepted the premise that the railroad employer was negligent in several respects, any one of which would have been actionable in its own right." *Id.* at 556, 608 S.E.2d at 454 (Goolsby, J., dissenting).

We find the Court of Appeals correctly held that *Blair* supports the reversal of summary judgment.[9] The *Blair* Court expressly instructed that in a FELA case, the railroad's conduct should be judged "as a whole," especially when the circumstances "from which negligence might be inferred are so closely interwoven as to form a single pattern, and where each imparts character to the others." 323 U.S. at 604, 65 S.Ct. 545. Clearly, this language should not be interpreted as meaning that each theory of negligence must also stand on its own. Such an interpretation would negate the idea of looking at the employer's conduct as a whole and as forming a pattern.

We are mindful of *Blair's* admonition that "[t]o deprive railroad workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them." *Id.* at 602, 65 S.Ct. 545 (citation and internal quotation marks omitted). We believe this is such a close case where negligence may be inferred from various circumstances in combination, i.e., by evaluating CSX's conduct "as a whole." Accordingly, the *Blair* decision was appropriately relied upon to justify reversing summary judgment.

## CONCLUSION

In sum, we affirm as modified the Court of Appeals' opinion. We affirm the Court of Appeals' overall holding that the trial court erred in granting summary judgment for CSX. Accordingly, the case shall be remanded for trial. We hold, however, that in a FELA case, there is a relaxed standard of proof only on the causation element.

**AFFIRMED AS MODIFIED.**

TOAL, C.J., MOORE, J. and Acting Justice J. MICHAEL BAXLEY, concur.

PLEICONES, J., concurring in result only.

---

9. However, we do not agree with the Court of Appeals' statement that the facts of this case establish CSX's "negligence as a matter of law."